[No. B180004. Second Dist., Div. Seven. May 18, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOE AMALL WALKER, Defendant and Appellant.

**COUNSEL**

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and Adrian N. Tigmo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PERLUSS, P. J.**—Joe Amall Walker previously raped and assaulted two women, one of whom was a prostitute (Irma P.) and one of whom was not (Dorothy B.), and assaulted a second prostitute after she had agreed to have sex with him (Stephanie L.). During Walker's trial for the asphyxiation murder of Kathryn M. Waters, also a prostitute, the People were allowed to introduce evidence of Walker's three prior sexual assaults on these women to establish identity, motive and intent pursuant to Evidence Code section 1101, subdivision (b),[1] as well as to prove Walker's predisposition to commit the current offense pursuant to section 1108, subdivision (a). The jury convicted Walker of second degree murder.

■ Evidence of Walker's attacks on Irma P. and Stephanie L. was properly admitted at Walker's murder trial on the issues of motive and intent

---

[1] Statutory references are to the Evidence Code unless otherwise indicated.

and, with respect to Irma P., as to identity as well. However, because Walker was not accused of a sexual offense within the meaning of section 1108, it was error to permit the People to introduce evidence of Walker's prior criminal conduct to prove his propensity to kill Waters. It was also error to admit evidence of Walker's assault and rape of Dorothy B. because of the dissimilarity between the circumstances of that crime and Waters's murder. Nonetheless, the court's improper admission of evidence and its related error in instructing the jury concerning the purposes for which that evidence could be considered were harmless. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Information*

In an amended information filed on October 14, 2004, Walker was charged in a single count with the first degree murder of Waters (Pen. Code, § 187, subd. (a)). The information alleged Walker had suffered a prior serious or violent felony conviction within the meaning of the "Three Strikes" law (Pen. Code, §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and Penal Code section 667, subdivision (a)(1), and had served four separate prison terms for prior felony convictions (Pen. Code, § 667.5, subd. (b)).[2] Walker pleaded not guilty and denied the special allegations.

### 2. *Waters's Murder and Evidence of Walker's Involvement*

Kathryn Waters worked as a prostitute to support her heroin addiction. Her badly bruised body was found in a parking lot in Monterey Park on February 23, 2003. Waters had been strangled and died of asphyxia; the bruises on her head and face were caused by blunt trauma force; the bruises on her left hand and wrist were consistent with defensive injuries. DNA from semen found on Waters's external genitalia and one nipple matched Walker's.

Walker, a freelance automobile mechanic, resided at a sober living facility in Carson and attended a rehabilitation program for recovering addicts in downtown Los Angeles. The rehabilitation program was housed in a building adjacent to the apartment complex in which Waters lived.

Jon Wilson, Waters's boyfriend, told a detective from the Los Angeles County Sheriff's Department he last saw Waters on February 22, 2003, when

---

[2] The amended information was further amended on November 9, 2004, on the People's motion to reflect the true date of one of Walker's prior convictions.

she left her apartment to meet a customer she referred to as "the mechanic." According to Wilson, Waters had engaged in prostitution with "the mechanic" in her apartment two or three times in the month prior to her death. Wilson provided a description of "the mechanic" that matched Walker's description; he then identified Walker as "the mechanic" from a photograph.[3] Walker's telephone number and the name "Joe" were written on a business card found in Waters's apartment.

The People and Walker stipulated that a postmortem sexual assault examination was performed on Waters, that the findings were consistent with sexual contact (full or partial or attempted sexual penetration) during the hours or days just prior to Waters's death and that there was no medically valid way to determine whether the sexual contact occurred with or without Waters's consent. That stipulation was presented to the jury.

### 3. The Defense Theory and Contradictory Trial Testimony

The defense indirectly suggested at trial that Waters may have been killed by her boyfriend Wilson, a drug dealer with a criminal record involving prior assaults and corporal injury to a spouse or cohabitant.

In an interview with investigators from the sheriff's department approximately five weeks after Waters's body was discovered,[4] Walker—who did not testify at trial—acknowledged knowing Waters but denied ever having sex with her and attempted to establish an alibi. Walker contended that on February 22, 2003, the day before Waters's body was found, he was working on a car at 118th Street and Wilmington Avenue in south Los Angeles, where it had broken down, and later on Wilmington Avenue, after the car broke down again. Walker maintained he worked on the car until dark and then returned to the sober living house in Carson.

---

[3] At trial Wilson denied saying that Waters had identified the customer she went to see as "the mechanic" or identifying Walker in a photograph. However, Wilson, who was then in prison for selling cocaine, also testified he had answered the detective's questions when interviewed prior to his current incarceration. After Wilson's testimony the investigating detective explained prisoners who testify against fellow convicts are often subject to reprisal and, in fact, just before Wilson had been sent to prison the detective had asked him "if he was going to tell the truth on the witness stand about previous statements he had made to [the detective] and [Wilson] said, 'No, I can't. You know that.' "

[4] Prior to being questioned, Walker, who was then in custody for a parole hold, was advised of his right to remain silent, to the presence of an attorney and, if indigent, to appointed counsel. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].)

Records for Walker's cellular telephone introduced at trial, however, were inconsistent with his alibi.[5] The documents show that an outgoing call was made at 1:00 p.m. from a location near Waters's residence in downtown Los Angeles. A series of outgoing calls were made between 4:15 p.m. and 6:24 p.m from Huntington Park, an industrial area about six miles from 118th Street and Wilmington Avenue. A call was then made at 7:47 p.m. from the vicinity of Temple City, where Walker had once lived and which is in the opposite direction from the sober living house.

In addition, at trial Stephen Brame, who had resided in the same sober living house and attended the same drug rehabilitation program as Walker, testified Walker told him he had paid sex with Waters in her apartment.

### 4. Admission of Evidence of Prior Sexual Assaults Committed by Walker

Prior to trial the court granted the People's motion pursuant to sections 1101 and 1108 to introduce evidence of three prior sexual assaults committed by Walker. In July 1981 Walker was convicted of assaulting Dorothy B. with a deadly weapon. According to Dorothy B.'s testimony, the incident occurred when she was hitchhiking from Chino, where she had visited her boyfriend, to her home in Chatsworth. Because her boyfriend was a truck driver who made deliveries in Los Angeles and Dorothy B. had been with him on some of those occasions, she made her way to a truck stop in Los Angeles to look for someone she might know to give her a ride. Not recognizing anyone, Dorothy B. began asking for a ride from the truck drivers present. Walker told Dorothy B. he was a truck driver and could give her a ride. As they walked through a dark, remote train yard to Walker's truck, Walker said he had a weapon and forced Dorothy B. into an empty train car where he had intercourse with her against her will. Walker would not let Dorothy B. leave; he said he had a gun and threatened to "blow [her] head off." Just before morning, as Walker was walking Dorothy B. back to the truck stop, gripping her arm, she managed to break free.

In April 1983 Walker was convicted of raping Irma P. Irma P. testified she was a heroin-addicted prostitute who worked at a truck stop in Los Angeles

---

[5] When a cellular telephone is turned on, it sends a signal to the wireless service provider. The provider constantly monitors the telephone's signal strength so it can determine the cell site that will provide the strongest signal strength as the caller moves from location to location. Generally, a cellular telephone does not transmit to a cell site located more than two miles away. The provider maintains in its database records of a cellular telephone's outgoing calls and the cell sites used for those calls.

that Walker frequented almost daily. On December 14, 1982, Walker approached Irma P. as she left a restaurant in the area at approximately 3:00 a.m. Walker asked her to walk with him and then pulled out a knife. With the knife pressed to her side, Walker took Irma P. into a vacant building; told her to remove her clothes; and, after she took her pants off, began hitting her in the ribs and face and choking her. He raped her and stated several times "that he hated fucking whores." Irma P. was able to escape after telling Walker she heard a noise and thought someone was with them in the building. As they left the building, Walker released Irma P.

According to the testimony of Christopher Schaper, who at the time was an officer with the Los Angeles Police Department, at approximately 7:15 p.m. on December 14, 1982, the same day as the rape and assault of Irma P., he and his partner saw Walker walking with a woman they believed was a prostitute, Stephanie L., in the area where Irma P. had been raped. The officers followed the pair to see whether they would engage in an act of prostitution. After Walker and Stephanie L. turned into a dead-end alley, the officers waited about 15 seconds and then heard a woman screaming. Schaper jumped out from his position and saw Stephanie L. lying face down on the ground with Walker sitting on top of her, trying to cut the back of her neck with a large hair comb. Stephanie L. told the officers she had agreed to have sex with Walker, but as soon as they got in the alley he knocked her down, jumped on her, tried to pull her pants off and then started cutting the back of her neck. After the officers took Walker into custody and were walking him to their police car, Irma P. approached the officers and started yelling that Walker was the man who had attacked her.

### 5. *Jury Instructions Concerning Other-crimes Evidence*

The trial court instructed the jury pursuant to CALJIC No. 2.50 that evidence of other crimes committed by Walker, if believed, may be considered for the limited purpose of determining if it tends to show the identity of the person who committed the crime, the existence of the intent that is a necessary element of the crime charged, a motive for the commission of the crime charged or a characteristic method or plan in the commission of criminal acts similar to that used in the commission of the offense for which Walker was being tried such that it tended to show either the identity of the person who committed the crime or the existence of the intent that is a necessary element of the crime charged.[6] The jury was also instructed

---

[6] CALJIC No. 2.50 as modified by the court and given to the jury in this case provides, "Evidence has been introduced for the purpose of showing that the defendant committed [crimes] other than that for which [he] is on trial. [¶] [Except as you will otherwise be instructed,] [this] evidence, if believed, [may not be considered by you to prove that defendant is a person of bad character or that [he] has a disposition to commit crimes. It] may be

pursuant to CALJIC No. 2.50.01 that evidence had been introduced to show Walker had engaged in a sexual offense on one or more occasions other than that charged in the pending case and, if it found Walker had committed one or more prior sexual offenses, it may infer that he had a disposition to commit sexual offenses and may further infer he was likely to commit and did commit the crime charged.[7] The court admonished the jury, in the language of CALJIC No. 2.50.1, that it must not consider the evidence Walker had committed other crimes or sexual offenses unless it finds that he had done so by a preponderance of the evidence and further cautioned the jury, "[B]efore a defendant can be found guilty of any crime charged [or any included crime] in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime."[8]

---

considered by you for the limited purpose of determining if it tends to show: [¶] [A characteristic method or plan in the commission of criminal acts similar to the method or plan used in the commission of the offense in this case which would further tend to show [the existence of the intent which is a necessary element of the crime charged] [or] [the identity of the person who committed the crime, if any, of which the defendant is accused;] [¶] [The existence of the intent which is a necessary element of the crime charged;] [¶] [The identity of the person who committed the crime, if any, of which the defendant is accused;] [¶] [A motive for the commission of the crime charged;] [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case."

[7] CALJIC No. 2.50.01 as modified by the court and given to the jury in this case provides, "Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense [on one or more occasions] other than that charged in the case. [¶] ['Sexual offense' means a crime under the laws of a state or of the United States that involves any of the following: [¶] [A.] [Any conduct made criminal by Penal Code section 261. The elements of [this crime] are set forth elsewhere in these instructions.] [¶] [B.] [Any conduct made criminal by Penal Code section 220. The elements of this crime are set forth elsewhere in these instructions.] [¶] [C.] [Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person.] [¶] If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that [he] was likely to commit and did commit the crime of which [he] is accused. [¶] However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that [he] committed the charged crime. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime." Other instructions given the jury described the elements of rape by force or threats (Pen. Code, § 261, subd. (a)(2); CALJIC No. 10.00) and assault with intent to commit rape (Pen. Code, § 220; CALJIC No. 9.09).

[8] CALJIC No. 2.50.1 given to the jury provides, "Within the meaning of the preceding instruction[s], the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed [crime[s]] [or] [sexual offense[s]] other than [that] for which [he] is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that [the] defendant committed the other [crime[s]] [or] [sexual offense[s]]. [¶] [If you find other crime[s] were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of

### 6. *The Jury's Verdicts and Walker's Sentence*

The jury convicted Walker of one count of second degree murder. In a bifurcated trial the jury found true the special allegation that Walker had suffered a prior serious felony conviction (his 1983 conviction for the rape of Irma P.) within the meaning of both the Three Strikes law and Penal Code section 667, subdivision (a), and that he had also suffered four felony convictions for which he had served separate prison terms (Pen. Code, § 667.5, subd. (b)). Walker was sentenced to an aggregate state prison term of 38 years to life (15 years to life for second degree murder, doubled under the Three Strikes law, plus a five-year enhancement for the prior serious felony and three one-year enhancements for the prior prison term).[9]

## CONTENTIONS

Walker contends evidence of his prior sexual assaults was not admissible under either section 1101 or section 1108 and, even if admissible under section 1101, the court committed prejudicial error by instructing the jury it could consider that evidence to infer he had a predisposition to commit sexual offenses and was therefore likely to have committed the charged offense.

## DISCUSSION

### 1. *Standard of Review*

A trial court's determination of the admissibility of evidence of uncharged offenses is generally reviewed for an abuse of discretion. (*People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169] (*Kipp*) ["On

---

any crime charged [or any included crime] in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime.]"

[9] The trial court properly declined to impose both a five-year enhancement pursuant to Penal Code section 667, subdivision (a), and a one-year enhancement pursuant to Penal Code section 667.5, subdivision (b), for Walker's 1983 rape conviction. (*People v. Jones* (1993) 5 Cal.4th 1142, 1153 [22 Cal.Rptr.2d 753, 857 P.2d 1163].) However, the court neither struck the duplicative one-year enhancement, as the Supreme Court directed be done in *Jones*, nor imposed and then stayed execution of the additional term, as now appears to be the appropriate disposition under these circumstances. (Cal. Rules of Court, rule 4.447; see *People v. Lopez* (2004) 119 Cal.App.4th 355, 364 [14 Cal.Rptr.3d 202] [*Jones* "did not actually discuss whether striking the unused enhancement finding was the appropriate remedy"; correct procedure would have been "to impose a sentence on the barred enhancement, but then stay execution of that sentence"].) Accordingly, the abstract of judgment is ordered corrected to reflect imposition of an additional one-year term pursuant to Penal Code section 667.5, subdivision (b), based on the jury's true findings as to Walker's April 18, 1983 conviction and prison sentence in Los Angeles Superior Court case No. A385922, and a stay of execution of that additional one-year term. The stay shall become permanent upon Walker's service of the portion of his sentence not stayed.

appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion."]; *People v. Carter* (2005) 36 Cal.4th 1114, 1149 [32 Cal.Rptr.3d 759, 117 P.3d 476] (*Carter*).)[10] To the extent the trial court's ruling depends on the proper interpretation of the Evidence Code, however, it presents a question of law; and our review is de novo. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

### 2. *General Principles Governing Evidence of Uncharged Misconduct*

■ California law has long precluded use of evidence of a person's character (a predisposition or propensity to engage in a particular type of behavior) as a basis for an inference that he or she acted in conformity with that character on a particular occasion: Section 1101, subdivision (a),[11] "prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*).) Indeed, " '[t]he rule excluding evidence of criminal propensity is nearly three centuries old in the common law. [Citation.]' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 913 [89 Cal.Rptr.2d 847, 986 P.2d 182] (*Falsetta*).)

Section 1101, subdivision (b),[12] clarifies, however, that this rule "does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*Ewoldt, supra,* 7 Cal.4th at p. 393; see *Falsetta, supra,* 21 Cal.4th at p. 914 ["the rule against admitting evidence of the defendant's other bad acts to prove his present conduct was subject to far-ranging exceptions," citing § 1101, subd. (b)].) " '[E]vidence of uncharged crimes is

---

[10] An abuse of discretion will not be found unless the trial court has exceeded the bounds of reason by exercising its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

[11] Section 1101, subdivision (a), provides, "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."

[12] Section 1101, subdivision (b), provides, "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.]' " (*Carter, supra,* 36 Cal.4th at p. 1147.) "As Evidence Code section 1101, subdivision (b) recognizes, that a defendant previously committed a similar crime can be circumstantial evidence tending to prove his identity, intent, and motive in the present crime. Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion." (*People v. Roldan* (2005) 35 Cal.4th 646, 705 [27 Cal.Rptr.3d 360, 110 P.3d 289]; see Simons, Cal. Evidence Manual (2006) § 6.10, p. 422.) When a defendant pleads not guilty, he or she places all issues in dispute, and thus the perpetrator's identity, intent and motive are all material facts. (*Roldan,* at pp. 705–706; see also *People v. Beyea* (1974) 38 Cal.App.3d 176, 195 [113 Cal.Rptr. 254] ["In a prosecution for murder, proof of motive is material to a finding of premeditation and deliberation [citation]"].)[13]

■ In addition to its relevance to an issue other than predisposition or propensity, to be admissible under section 1101, subdivision (b), the probative value of the evidence of uncharged crimes "must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Kipp, supra,* 18 Cal.4th at p. 371; see also *Carter, supra,* 36 Cal.4th at p. 1149.)

Notwithstanding the general rule prohibiting evidence of prior acts of misconduct to prove predisposition or propensity, in 1995 the Legislature enacted section 1108 authorizing in sexual offense cases the admission of evidence of the defendant's other sexual offenses to prove his or her propensity to commit the charged sex offense. "In a criminal action in which

---

[13] Although Walker argued at the pretrial hearing on the People's motion to admit evidence of his prior offenses that he did not intend to contest intent, because the People still had the burden of proving that element of the crime charged (first degree murder), his assertion was insufficient to eliminate intent as an issue. (*Ewoldt, supra,* 7 Cal.4th at p. 400, fn. 4 [a defendant's not guilty plea places the elements of the crime in issue for the purpose of deciding the admissibility of evidence of uncharged misconduct unless the defendant has taken some action to narrow the prosecution's burden of proof; the prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense].)

the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) "Available legislative history indicates section 1108 was intended in sex offense cases to relax the evidentiary restraints section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility. In this regard, section 1108 implicitly abrogates prior decisions of this court indicating that 'propensity' evidence is per se unduly prejudicial to the defense." (*Falsetta, supra,* 21 Cal.4th at p. 911; see *People v. Britt* (2002) 104 Cal.App.4th 500, 505–506 [128 Cal.Rptr.2d 290] [" 'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible *without regard to the limitations of Evidence Code section 1101.*' [Citation.] When section 1108 swept away the general prohibition on character evidence set forth in section 1101, it rendered moot the exceptions to that prohibition created by section 1101, subdivision (b)."].)[14]

Because the trial court allowed evidence of Walker's prior sexual assaults under both sections 1101, subdivision (b), and 1108, we can find error in its admission only if the testimony was inadmissible under both sections. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 280–281 [109 Cal.Rptr.2d 870].) However, even if the evidence of Walker's other crimes was properly admitted, the propriety of the court's instructions concerning the purposes for which that evidence could be considered—and, in particular, whether it was error to instruct the jury that it could consider the evidence as proof of Walker's criminal disposition—necessarily depends on whether the evidence was admissible under section 1101 or section 1108 or both.

    3.   *Walker Was Not Accused of a "Sexual Offense" Within the Meaning of Section 1108*

■    Section 1108 permits the trier of fact to consider a defendant's prior sexual offenses as propensity evidence only in "a criminal action in which the defendant is accused of a sexual offense." (§ 1108, subd. (a); see also *People v. Pierce* (2002) 104 Cal.App.4th 893, 897–900 [128 Cal.Rptr.2d 397].) Section 1108, subdivision (d)(1), defines "sexual offense" as a crime under the law of a state or of the United States involving either conduct proscribed by a series of enumerated Penal Code sections or nonconsensual sexual contact. It also includes in the definition, in subdivision (d)(1)(E), any crime that involves

---

[14] The Supreme Court in *Falsetta, supra,* 21 Cal.4th at pages 910, 922, held admission pursuant to section 1108 of evidence regarding a defendant's propensity to commit a sexual offense does not violate the defendant's constitutional right to due process of law.

"[d]eriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person."[15]

In their pretrial motion to permit evidence of Walker's prior sexual offenses, the People argued that, although murder was not an enumerated offense, section 1108, subdivision (d)(1)(E), was applicable in this case because Walker had a history of inflicting bodily injury and physical pain while engaged in sexual encounters with prostitutes or women he perceived to be prostitutes "with the stated motivation that he 'hate[s] fucking whores.' " The motion papers asserted Walker acted with the same motivation when he murdered Waters. The trial court agreed, "My initial thought was that since there is no sexual offense charged, under my view of what [a] sexual offense is, that is one of the listed offenses, that I was not going to let [the evidence] in, but it does appear that the definition . . . appears to be broader than what I've come . . . to believe are sexual offenses, that are things that contain sexual elements in the actual charge. It appears that 1108 (d)(1)(E), expands the definition of sexual offense sufficiently to include the offense that's charged in this case."

Although murder, standing alone (Pen. Code, § 187, subd. (a)), is not one of the offenses enumerated in section 1108, subdivision (d)(1), there can be no question certain murder charges would qualify as "sexual offenses" within the meaning of that provision—for example, a charge of first degree murder alleging special circumstances under Penal Code section 190.2, subdivision (a)(17)(C), (D), (E), (F) and (K) (murder committed while the defendant was engaged in, or accomplice in, commission of, attempted commission of, or immediate flight after committing, or attempting to commit rape, sodomy or other specified sexual crimes). In such a case the defendant is accused of a crime that involves conduct proscribed by section 1108, subdivision (d)(1)(A). (See *People v. Pierce, supra,* 104 Cal.App.4th at pp. 898–899 [assault with intent to commit rape was a sexual offense within the meaning of § 1108 prior to amendment to statute to expressly include assaults with the intent to commit specified felonies that require sexual intent].)

---

[15] In full, section 1108, subdivision (d)(1), defines "sexual offense" as "a crime under the law of a state or of the United States that involved any of the following: [¶] (A) Any conduct proscribed by Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 288, 288a, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6, of the Penal Code. [¶] (B) Any conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem. [¶] (C) Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person. [¶] (D) Contact, without consent, between the genitals or anus of the defendant and any part of another person's body. [¶] (E) Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person. [¶] (F) An attempt or conspiracy to engage in conduct described in this paragraph."

The question presented by the trial court's ruling in this case, however, is whether section 1108, subdivision (d)(1)(E)'s inclusion in the definition of sexual offense of crimes that involve "[d]eriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person" authorizes use of evidence of other sexual offenses when the circumstances under which a violent crime has been committed suggest the defendant derived sexual pleasure or gratification from the victim's pain, even though sexual pleasure or gratification is neither a necessary element of the charged offense nor alleged in the information as an enhancement or aggravating factor.

Without directly deciding the point, Division Six of this court in *People v. Pierce, supra,* 104 Cal.App.4th 893 indicated the answer to that question might be yes. In *Pierce* the defendant was charged with attempted kidnapping and assault with intent to commit rape in violation of Penal Code section 220 after he grabbed a 17-year-old girl walking home alone and attempted to pull her toward a dark area. (104 Cal.App.4th at p. 896.) When questioned by police, Pierce confessed he had attacked the victim and said "he was motivated by a sexual impulse—the same impulse he had 20 years earlier with a girl." (*Ibid.*) At the time of the offense section 1108 did not contain current subdivision (d)(1)(B), which includes within the definition of "sexual offense" a crime involving "[a]ny conduct proscribed by section 220 of the Penal Code, except assault with intent to commit mayhem."[16] Rejecting Pierce's argument that, absent the specific reference to Penal Code section 220, assault with intent to commit rape was not a sexual offense within the meaning of section 1108, Division Six held such an assault is an aggravated form of attempted rape and thus involves conduct proscribed by the offenses listed in section 1108, subdivision (d)(1)(A). Accordingly, the court affirmed the trial court's decision overruling Pierce's objection to evidence of his prior Santa Barbara rape conviction.

As an alternate ground for concluding Pierce's prior sexual offense was properly admitted under section 1108, Division Six held, "Pierce also comes within section 1108, subdivision (d) because his offense involves '[a]n attempt . . . to engage in conduct described in this paragraph.' [Citation.] The instant offense was committed to derive 'sexual pleasure or gratification from the infliction of death, bodily injury or physical pain on another person.' [Citation.]" (*People v. Pierce, supra,* 104 Cal.App.4th at p. 898.) The court thus held evidence a crime had been committed to derive sexual pleasure or gratification from the infliction of death, bodily injury or physical pain on

---

[16] Current subdivision (d)(1)(B) was added by the Legislature to section 1108 in 2002. (Stats. 2002, ch. 194, § 1.) The court in *People v. Pierce, supra,* 104 Cal.App.4th at page 899, concluded the amendment did not expand the definition of sexual offense but rather clarified the preexisting statute by explicitly including an offense that previously fell within it.

another person was relevant to the determination whether the defendant was accused of a sexual offense within the meaning of section 1108. Yet the court did not conclude Pierce's admission the crime was "motivated by a sexual impulse," by itself, was sufficient to convert an otherwise nonsexual crime (for example, attempted kidnapping) into a "sexual offense."

■ The analysis in *Pierce* notwithstanding, the language of section 1108, although by no means definitive, points to a construction of subdivision (d)(1)(E) that limits its application to crimes in which deriving sexual pleasure or gratification through inflicting physical pain is an element of the charge (or applicable enhancement or aggravating factor) and not simply a circumstance of the crime's commission. Section 1108, subdivision (a), limits the statute's scope to criminal actions in which the defendant is "accused of a sexual offense"; and subdivision (d)(1) defines "sexual offense" to mean a "crime . . . that involve[s]" certain categories and enumerated types of sexual misconduct. In ordinary usage these terms connote that the requisite sexual transgression must be an element or component of the crime itself without regard to the evidence establishing a specific violation. (See *People v. Yartz* (2005) 37 Cal.4th 529, 537–538 [36 Cal.Rptr.3d 328, 123 P.3d 604] [in construing a statute we look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning, to determine the Legislature's intent and purpose]; *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [73 Cal.Rptr.2d 682, 953 P.2d 858] [in resolving questions of statutory interpretation, the court "must attempt to effectuate the probable intent of the Legislature, as expressed through the actual words of the statutes in question"; the first step " ' "is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning. [Citations.]" [Citation.]' "].)

In a closely analogous situation, the admissibility of a prior felony conviction that "involves moral turpitude" to impeach a witness's credibility (including a defendant who elects to testify), the Supreme Court has held, "a witness' prior conviction should only be admissible for impeachment if the least adjudicated elements of the conviction necessarily involve moral turpitude." (*People v. Castro* (1985) 38 Cal.3d 301, 317 [211 Cal.Rptr. 719, 696 P.2d 111].) The "least adjudicated elements" test of *Castro* means that "from the elements of the offense alone—without regard to the facts of the particular violation—one can reasonably infer the presence of moral turpitude." (*People v. Thomas* (1988) 206 Cal.App.3d 689, 698 [254 Cal.Rptr. 15]; accord, *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1091 [125 Cal.Rptr.2d 896].) By a parity of reasoning, whether a crime involves deriving sexual pleasure or gratification from inflicting physical pain should also be determined from the elements of the offense alone and not from the evidence establishing a particular violation of the law.

■  The Supreme Court's decision in *Falsetta, supra,* 21 Cal.4th 903, which upheld the constitutionality of section 1108, further supports our conclusion the section is properly limited to crimes in which sexual misconduct is an element of the charged offense (and of the offenses offered as evidence of the defendant's predisposition to commit the charged offense). In rejecting a constitutional challenge to the statute, the *Falsetta* court emphasized the limited scope of section 1108's authorization for the use of propensity evidence in sexual offenses cases: "Had section 1108 allowed unrestricted admission of defendant's other 'bad acts,' character, or reputation, his due process argument would be stronger. But on its face, section 1108 is limited to the defendant's *sex offenses,* and it applies only when he is charged with committing *another sex offense*. No far-ranging attacks on the defendant's character can occur under section 1108." (*Falsetta,* at p. 916.)

Finally, this more limited interpretation of section 1108 is reinforced by the section's legislative history, which establishes the Legislature's intent to permit the admission of propensity evidence in a specific subset of crimes— the traditional sexual offenses enumerated in section 1108, subdivision (d)(1)(A), such as rape, sexual battery and lewd or lascivious acts, where the outcome of the prosecution frequently turns on determining the relative credibility of victim and defendant: "As the legislative history indicates, the Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*Falsetta, supra,* 21 Cal.4th at p. 915; see *id.* at p. 912 ["As a letter by the author of the legislation, contained in the Assembly Journal, states, section 1108 ' "permits courts to admit such evidence on a common sense basis . . . and permits rational assessment by juries of evidence so admitted. This includes consideration of the other sexual offenses as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." ' [Citation.]"].)[17]

This interpretation does not limit sexual offenses to crimes enumerated in section 1108, subdivision (d)(1)(A) and (B), and thus render superfluous the other portions of subdivision (d)(1) defining "sexual offense." The definition

---

[17] The *Falsetta* court also noted, "The Legislature [has] 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.' " (*Falsetta, supra,* 21 Cal.4th at p. 912.)

of sexual offense not only triggers application of section 1108 but also describes those types of uncharged misconduct that can be offered as propensity evidence in a criminal action in which the defendant is accused of a sexual offense. Because evidence of such uncharged sexual offenses may include crimes under the laws of not just California but of any state or the United States, it would be impractical to attempt to identify all covered offenses. Consequently, by including the broader language of section 1108, subdivision (d)(1)(C), (D) and (E), the statute encompasses sexual offenses from other jurisdictions that may not have exact counterparts under California law. (See generally *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906] [discussing "rule of statutory interpretation that requires us, if possible, to give effect and significance to every word and phrase of a statute"].)

Because murder is not one of the sexual offenses enumerated in section 1108, subdivision (d)(1)(A) or (B) and the crime with which Walker was charged did not involve as one of its necessary adjudicated elements deriving sexual pleasure or gratification from inflicting death, bodily injury or physical pain on his victim, the trial court erred in allowing the People to introduce evidence of Walker's three prior sexual attacks on women as evidence of his propensity to commit the charged offense. However, even if we were to agree with the People and conclude the trial court properly interpreted section 1108, subdivision (d)(1)(E), to authorize proof of prior sexual assaults when the circumstances under which the charged crime has been committed indicate the defendant derived sexual pleasure or gratification by injuring the victim, the People in this case failed to present any evidence—either at the time of their pretrial motion or at trial—Walker's murder of Waters was sexually motivated. To be sure, evidence was introduced that Walker said he hated prostitutes and had in the past beaten the victims of his sexual attacks. But, unlike the situation in *People v. Pierce, supra*, 104 Cal.App.4th at page 896, in which the defendant admitted his attack had been motivated by a sexual impulse, here, other than the challenged propensity evidence itself, there was no evidence Walker's sexual contact with Waters was nonconsensual and similarly no evidence her murder was motivated by Walker's desire for sexual gratification (as opposed, for example, to impulsive violence linked to rage or humiliation). Thus, even under a broad reading of section 1108, it was error to admit evidence of Walker's prior sexual assaults to prove his propensity to murder Waters.

### 4. *Evidence of Walker's Prior Sexual Assaults on Prostitutes Was Admissible Under Section 1101, Subdivision (b)*

In addition to arguing evidence of Walker's three prior sexual assaults was admissible under section 1108, the People's pretrial motion asserted the

evidence was admissible under section 1101, subdivision (b), to prove Walker's identity as the perpetrator, his criminal intent in beating and choking his victim (as opposed to death resulting from mistake or accident in connection with consensual rough sex) and his "common motive of animus against prostitutes resulting in violent batteries interrupting the completion of the sex act . . . ." The trial court agreed, finding the evidence admissible to prove Walker's identity, motive and intent; it additionally ruled the evidence need not be excluded pursuant to section 352 because it would not be unduly prejudicial.

### a. *Evaluating the admissibility of uncharged misconduct*

"Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*Kipp, supra,* 18 Cal.4th at p. 369.) "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt, supra,* 7 Cal.4th at p. 402.) The more often a similar result occurs, the less likely it is the defendant acted inadvertently or in self-defense. Consequently, "to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably habor[ed] the same intent in each instance." [Citations.]' " (*Ibid.*; see *People v. Stitely* (2005) 35 Cal.4th 514, 532 [26 Cal.Rptr.3d 1, 108 P.3d 182] ["the degree of similarity required to prove *mental state* is far less exacting [than required to prove identity]. The two acts need only be sufficiently similar to suggest that the defendant probably had the same intent each time."].)

"A greater degree of similarity is required in order to prove the existence of a common design or plan." (*Ewoldt, supra,* 7 Cal.4th at p. 402.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id.* at p. 403.) "[A] common scheme or plan focuses on the manner in which the prior misconduct and the current crimes were committed, i.e., whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances." (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1020 [80 Cal.Rptr.2d 676].)

The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. "To be relevant on the issue of identity, the uncharged crimes must be highly similar to the charged offenses." (*Kipp, supra,* 18 Cal.4th at p. 369.) "For identity to be established, the uncharged misconduct and the charged offense must share common

features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' " (*Ewoldt, supra,* 7 Cal.4th at p. 403.) " 'The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.' " (*Carter, supra,* 36 Cal.4th at p. 1148.) "To be highly distinctive, the charged and uncharged crimes need not be mirror images of each other." (*Ibid.*) Differences in highly distinctive crimes go to the weight of the evidence not its admissibility. (*Ibid.*)

In contrast, motive "may be established by evidence of 'prior dissimilar crimes.' [Citation.] 'Similarity of offenses [is] not necessary to establish this theory of relevance' for the evident reason that the motive for the charged crime arises simply from the commission of the prior offense." (*People v. Scheer, supra,* 68 Cal.App.4th at p. 1018.) However, a nexus or direct link must still exist between the prior crime and the charged offense. (*Id.* at p. 1020.) In some instances, the commission of the prior offense is itself not the incentive for commission of the charged crime but "[t]he presence of the same motive in both instances may be a contributing factor in finding a common plan or design." (*Id.* at pp. 1020–1021.) In such cases, the offenses must "share common features." (*People v. McDermott* (2002) 28 Cal.4th 946, 999 [123 Cal.Rptr.2d 654, 51 P.3d 874].)

### b. *Evidence of the rape and beating of Irma P.*

Viewing the evidence in the light most favorable to the trial court's ruling (see *Carter, supra,* 36 Cal.4th at p. 1148), Walker's rape and beating of Irma P. share common features with Waters's murder that are sufficiently distinctive to support an inference Walker committed both acts. Both victims were drug-addicted prostitutes. Walker engaged in sexual activity with both women before they were assaulted.[18] Both victims were beaten in the face, resulting in significant bruising around the face and eyes, and strangled. (Cf. *Carter,* at p. 1148 ["Although defendant notes certain differences in the circumstances surrounding the victims' deaths, the combination of fatal strangulation and placement of a young woman's body in a closed bedroom closet is both highly distinctive and suggestive that the same person perpe- trated the crimes . . . ."]; *Kipp, supra,* 18 Cal.4th at p. 370 [charged and uncharged offenses in which defendant strangled 19-year-old women in one location, carried victims' bodies to another location and covered bodies with

---

[18] Although it was not medically feasible to determine whether Walker had raped Waters, as he did Irma P., Walker's semen was found on Waters's external genitalia and nipple. The evidence of sexual contact with both Irma P. and Waters is a distinctive mark of similarity between the two incidents.

bedding and victims both had bruises on legs and were similarly disrobed had common features sufficient to support inference of identity]; *People v. Sully* (1991) 53 Cal.3d 1195, 1224–1225 [283 Cal.Rptr. 144, 812 P.2d 163] [common characteristics of illicit sex, use of cocaine and abuse of prostitutes sufficient to support admission of other-crimes evidence on issues of identity and intent of perpetrator].) The fact Waters but not Irma P. was murdered does not negate the similarity of the two incidents. (See *ibid.* [charged crimes included murder; other-crimes evidence was of imprisonment, rape and assault].)

c. *Evidence of the sexual assault on Stephanie L.*

Walker's assault on Stephanie L. shared many of the distinctive features of the murder charged in the instant case: The evidence strongly suggested Stephanie L. was a prostitute; Walker engaged her to have paid sex; and, although he did not strangle her, he did attempt to cut her neck; the same body part that is the focus of strangulation. Because Walker was interrupted by law enforcement officers moments after beginning to attack Stephanie L., the fact he did not actually begin a sex act, beat her in the face or strangle her does not significantly reduce the similarities between the two incidents. In addition, the assault on Stephanie L. occurred the night after, and in the same location as, Walker's rape and assault on Irma P. Although these similarities may not be sufficient to support an inference regarding identity, the trial court plainly did not abuse its discretion in concluding they were sufficient to allow testimony regarding the attack on Stephanie L. on the issues of intent and motive (animus towards prostitutes). (Cf. *Carter, supra,* 36 Cal.4th at p. 1148 ["Although the evidence of Kim's death did not share the distinctive features of the murders charged in the present case, it clearly was relevant on the issues of intent and a common plan."]; *People v. Stitely, supra,* 35 Cal.4th at p. 532.)

d. *Evidence of the rape of Dorothy B.*

Walker's sexual assault on Dorothy B., although plainly relevant and admissible if Walker were charged with a sexual offense, was not sufficiently similar to the circumstances of Waters's murder to support an inference regarding identity, motive or intent under section 1101, subdivision (b). Dorothy B. was not a prostitute nor was there any evidence Walker believed she was. She was not beaten in the face or choked; and there was no nexus or relationship between the two occurrences to support its admission to demonstrate motive. Consequently, the court erred in admitting evidence regarding this prior crime.

e. *Section 352 balancing*

██ Even if evidence of uncharged crimes is relevant under section 1101, subdivision (b), before admitting the evidence a trial court must also find it has substantial probative value that is not largely outweighed by its potential for undue prejudice under section 352.[19] (*Ewoldt, supra,* 7 Cal.4th at p. 404 [" 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' "]; *Kipp, supra,* 18 Cal.4th at p. 371.) A trial court should not exclude highly probative evidence unless the undue prejudice is unusually great. (*People v. Sassounian* (1986) 182 Cal.App.3d 361, 402 [226 Cal.Rptr. 880].) "Undue prejudice" refers not to evidence that proves guilt, but to evidence that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis: "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189]; see Simons, Cal. Evidence Manual, *supra,* § 1.28, p. 33 ["The term 'undue prejudice' connotes a sense of unfairness."].)

██ "The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of" the fact for which it is being admitted (in this case, identity, intent and motive). (*Ewoldt, supra,* 7 Cal.4th at p. 404.) Other factors affecting the probative value include the extent to which the source of the evidence is independent of the evidence of the charged offense, the amount of time between the uncharged acts and the charged offense and whether the evidence is "merely cumulative regarding an issue that was not reasonably subject to dispute." (*Id.* at pp. 404–406; see also *People v. Balcom* (1994) 7 Cal.4th 414, 427 [27 Cal.Rptr.2d 666, 867 P.2d 777].) The primary factors affecting the prejudicial effect of uncharged acts are whether the uncharged acts resulted in criminal convictions, thus minimizing the risk the jury would be motivated to punish the defendant for the uncharged offense, and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses. (*Ewoldt, supra,* 7 Cal.4th at p. 405; see also *People v. Ortiz* (2003) 109 Cal.App.4th 104, 118 [134 Cal.Rptr.2d 467] ["defendant had been punished—via convictions—for the prior bad acts

---

[19] Section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

introduced before the jury, a circumstance courts have acknowledged lessens its prejudicial impact"]; *People v. Kelley* (1997) 52 Cal.App.4th 568, 579 [60 Cal.Rptr.2d 653] ["Although such evidence is always prejudicial, the prejudice was minimized by proof of the [prior] conviction. It validated the evidence and minimized the chance a jury would punish him for the prior offense, for which he had already been punished."].)

The probative value of the evidence regarding Irma P. was substantial. Walker exclaimed to Irma P. he hated prostitutes; thus the evidence of his rape and beating of her established his motive to brutalize other prostitutes. Because of the similarities in the two crimes discussed *ante*, that evidence was also relevant to prove Walker's identity as Waters's murderer and to establish Walker's intent was to kill her, as opposed to her death occurring accidentally during an act of prostitution that involved rough sex.[20]

Although the time between the two offenses is significant, more than 20 years, Walker was incarcerated for approximately 11 of those years, thus minimizing the remoteness. The distinctive similarities of the two crimes further offset any prejudice resulting from remoteness. (See *People v. Pierce, supra,* 104 Cal.App.4th at p. 900 [23-year-old rape conviction when defendant was incarcerated for 12 years was not too remote; " '[s]ubstantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses. [Citation.]' "].) Additionally, the potential for prejudice was minimized because Walker had been convicted of raping Irma P.; and the evidence regarding her beating and rape was less inflammatory than the evidence of Waters's brutal beating and murder and was thus unlikely to evoke an emotional response from jurors. (Cf. *Carter, supra,* 36 Cal.4th at p. 1150 [other-crimes murders were not significantly more inflammatory than the charged murders and rapes]; *Kipp, supra,* 18 Cal.4th at p. 372 [evidence of uncharged rape and murder was not significantly more inflammatory than charged attempted rape and murder].)

The probative value of the evidence regarding Walker's sexual attack on Stephanie L. was similar to that of his rape of Irma P. Regarding the potential for prejudice, although Walker was not convicted of any crime as a result of his assault on Stephanie L., this offense was relatively minor in comparison to the viciousness of Waters's murder. On this record, we cannot say the trial court abused its discretion in determining the substantial probative value was not outweighed by the risk of undue prejudice. (*Carter, supra,* 36 Cal.4th at p. 1149.)

---

[20] Wilson, Waters's boyfriend, testified Waters liked "very rough sex," explaining she liked to have her hair pulled and liked to be held down so she could not move. He also testified there were times Waters came home after meeting customers with "bruises on her body" but "a smile on her face."

5. *The Trial Court's Errors in Admitting Evidence of Walker's First Sexual Attack and Instructing the Jury Concerning the Proper Use of the Prior Crimes Evidence Were Harmless*

    a. *The improper admission of evidence of Walker's assault on Dorothy B. was harmless*

Although the trial court erred in admitting evidence of Walker's assault on Dorothy B. under both section 1101, subdivision (b), and section 1108, subdivision (a), "the erroneous admission of prior misconduct evidence does not compel reversal unless a result more favorable to the defendant would have been reasonably probable if such evidence were excluded." (*People v. Scheer, supra,* 68 Cal.App.4th at pp. 1018–1019; *Carter, supra,* 36 Cal.4th at p. 1152 [error in failing to exclude evidence of uncharged misconduct does not require reversal "unless it is reasonably probable the outcome would have been more favorable to defendant had such evidence been excluded"].)

It is not reasonably probable Walker would have obtained a more favorable result if the evidence regarding Dorothy B. were excluded. Walker's semen was found on Waters's dead body belying Walker's protestations he never had sex with her, as did Walker's own admissions to his neighbor Stephen Brame. Cellular telephone records fully discredited his alibi he was repairing a car a substantial distance from Waters's apartment at critical times the day before her body was found. The properly admitted testimony regarding Walker's rape and beating of Irma P. and his attack on Stephanie L. provided strong evidence implicating Walker in Waters's murder.

In marked contrast, the improperly received evidence regarding Walker's assault on Dorothy B. was neither highly probative nor unduly prejudicial to Walker for the same reason it was not admissible: The facts are too dissimilar from Waters's murder. It is, in short, highly unlikely the evidence had any significant impact on the jury's verdict.

    b. *The erroneous instruction the jury could consider evidence of Walker's other sexual offenses on the issue of his disposition to commit murder was harmless*

Because testimony concerning Walker's assaults on Irma P. and Stephanie L. was properly before the jury pursuant to section 1101, subdivision (b), the court's error in also allowing the evidence under section 1108 affects only the purpose for which the jury could consider the evidence (and thus the court's instructions to the jury), not the admissibility of the evidence

itself.[21] (See *People v. Garceau* (1993) 6 Cal.4th 140, 186 [24 Cal.Rptr.2d 664, 862 P.2d 664] [trial court erred in instructing jury that evidence admitted pursuant to § 1101, subd. (b), could be considered for any purpose including the defendant's character or any trait of his character] disapproved on another point in *People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) As previously discussed, the jury was instructed with CALJIC No. 2.50.01, which informed the jury it could infer from the evidence of Walker's other offenses he had a disposition to commit sexual offenses and, if he had such a disposition, it could also infer he was likely to commit and did commit the charged offense (murder). Asserting the error was of constitutional dimension and citing *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769, revd. on other grounds *sub nom. Woodford v. Garceau* (2003) 538 U.S. 202 [155 L.Ed.2d 363, 123 S.Ct. 1398], Walker contends giving this instruction requires reversal of his conviction.

In *People v. Garceau, supra*, 6 Cal.4th at page 186, in affirming Robert Garceau's first degree murder conviction and death sentence for the brutal killing of his girlfriend and her 14-year-old son, the Supreme Court held an improper instruction permitting the jury to consider evidence Garceau had previously murdered one of his drug partners for any purpose, including his propensity to commit murder, was harmless error. In concluding the error did not prejudice Garceau, the court assumed without deciding that the federal harmless-error standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (federal constitutional error requires proof of harmlessness beyond a reasonable doubt) was applicable. (See *People v. Mower* (2002) 28 Cal.4th 457, 484 [122 Cal.Rptr.2d 326, 49 P.3d 1067] ["If a trial court's instructional error violates the United States Constitution, the standard stated in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] requires the People, in order to avoid reversal of the judgment, to 'prove beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained.' [Citation.] But if a trial court's instructional error violates only California law, the standard is that stated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], which permits the People to avoid reversal unless 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.]"].) Even under that more exacting standard, the Supreme Court concluded, the error was harmless because of the overwhelming evidence of Garceau's guilt. (*Garceau*, at p. 187.)

---

[21] To the extent the court improperly instructed the jury the attack on Stephanie L. could be considered on the issue of identity as well as motive and intent, any error was harmless in light of the substantial evidence of Walker's guilt. (Cf. *Carter, supra*, 36 Cal.4th at pp. 1149, 1151 [one of two uncharged murders not sufficiently similar to charged offense to be admitted to prove identity as well as intent; jury instruction that both uncharged murders could be used to prove not only intent and motive but also identity did not constitute reversible error].)

After the California Supreme Court affirmed Garceau's conviction and sentence and denied on the merits his petition for state postconviction relief, the United States Supreme Court denied his petition for a writ of certiorari. (*Garceau v. California* (1994) 513 U.S. 848 [130 L.Ed.2d 83, 115 S.Ct. 143].) Thereafter, Garceau filed an application for habeas corpus relief in federal district court. The district court held Garceau was not entitled to habeas relief on the merits; but the Ninth Circuit reversed in a two-to-one decision, concluding both that the erroneous instruction permitting the jury to consider Garceau's propensity to commit murder "so offended fundamental conceptions of justice and fair play as to rise to the level of a constitutional violation" (*Garceau v. Woodford, supra,* 275 F.3d at p. 775) and that the error was not harmless beyond a reasonable doubt: "The evidence against Garceau was not weighty; in fact, there was no direct physical evidence implicating Garceau and the conviction turned on the testimony of potentially biased witnesses." (*Id.* at p. 777.) "Virtually every single one of the prosecution's witnesses had some connection to the murder of the [victims] or some other self-interested reason for testifying against Garceau." (*Id.* at p. 772.)[22]

Even under the more exacting *Chapman* standard,[23] the trial court's erroneous instruction permitting the evidence of Walker's attacks on Irma P. and Stephanie L. to be considered with respect to his predisposition to commit murder was harmless. Unlike the situation in *Garceau,* direct physical evidence linked Walker to Waters and supported the conclusion (contrary to his denials) he had engaged in sex with her shortly before her death. The testimony that Walker had raped and beaten Irma P. and sexually attacked Stephanie L., considered for proper, limited purposes, provided additional compelling evidence of Walker's guilt. Furthermore, none of the witnesses who testified for the People had a "self-interested reason for testifying against [Walker]." In sum, we are persuaded the guilty verdict rendered in this trial " 'was surely unattributable to the error.' " (*People v. Quartermain* (1997) 16 Cal.4th 600, 621 [66 Cal.Rptr.2d 609, 941 P.2d 788].)

---

[22] Although the Ninth Circuit concluded an improper instruction permitting the jury to consider uncharged misconduct not only for the limited purposes authorized by section 1101, subdivision (b), but also to show the defendant's character and propensity to act in conformity with that character constituted federal constitutional error, the court acknowledged the United State Supreme Court, like the California Supreme Court, "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes. Indeed the Supreme Court has expressly declined to answer these questions [citation]." (*Garceau v. Woodford, supra,* 275 F.3d at pp. 774–775.) The Ninth Circuit's decision in *Garceau* was subsequently reversed by the United States Supreme Court on procedural grounds. (*Woodford v. Garceau, supra,* 538 U.S. 202.)

[23] Because we determine the error was harmless under *Chapman,* we need not resolve whether it is the applicable standard under these circumstances. (See *People v. Garceau, supra,* 6 Cal.4th at p. 186.)

## DISPOSITION

The judgment is affirmed. The abstract of judgment is ordered corrected to reflect imposition of an additional one-year sentence enhancement pursuant to Penal Code section 667.5, subdivision (b), and a stay of execution of that additional one-year term. The superior court is directed to prepare a corrected abstract of judgment and to forward it to the Department of Corrections.

Johnson, J., and Woods, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 30, 2006, S144512.