Filed 7/16/15  P. v. Beal CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E059214 |
| v. | (Super.Ct.No. SWF1102006) |
| MICHAEL LOUIS BEAL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark A. Mandio, Judge. Affirmed with directions.

Ronald R. Boyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Kristine Gutierrez and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Michael Beal, of attempted willful, premeditated and deliberate murder (Pen. Code, §§ 664/187, subd. (a)),[1] during which she inflicted great bodily injury (§ 12022.7, subd. (a)) and used a screwdriver (§ 12022, subd. (b)(1)). She was sentenced to prison for life, plus four years and appeals, claiming section 1101, subdivision (b) evidence should not have been admitted and the instruction given as to it was defective. We reject her contentions and affirm, while directing the trial court to correct errors appearing in the abstract of judgment. The facts will be set forth as part of the discussion of the first issue.

## ISSUES AND DISCUSSION

1. *Admission of Section 1101, subdivision (b) Evidence*

As part of their pretrial Motions in Limine, and during a subsequent hearing on them, the People moved to have the trial court admit evidence of defendant's attack on a victim in Hollywood, inter alia, premeditation and deliberation during the instant crime. The matter was broached again by the People after the victim of the instant crimes and those who witnessed it testified. The Hollywood victim testified during a section 402 hearing that she was 59 years old on April 26, 2011, when the crime defendant perpetrated on her occurred. She testified that as she got out of her car, which was parked on Sunset Boulevard, defendant, who was walking on the street, looked strangely at her. She went into a store, made a purchase, then came back outside and was headed

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

back towards her car. As she approached a cross walk, she saw defendant, whom she did not know, coming towards her in the cross walk. Their eyes met. Defendant had stepped onto the sidewalk and was 10 feet from defendant. She pulled her fanny pack away from where defendant was. She got four-to-five steps into the cross walk and someone tapped her on the shoulder. She looked up and saw defendant's closed fist coming at her face. The impact of the blow sent her to her knees. Defendant grabbed her by the hair and hit her face five-to-six times. She crawled back towards the sidewalk and defendant followed her, hitting and kicking her with her hands and feet several times while the victim was face down and defendant was on her back. The victim screamed for help. Someone ran at both of them and knocked defendant off the victim. Others helped and someone else subdued defendant. During pretrial proceedings concerning this evidence, the People represented that as a result of this offense, defendant had pled guilty to violating section 243, subdivision (d) (assault causing serious bodily injury[2]).

The instant victim had testified that she was 61 years old at the time of trial. On April 22, 2011, she and her two sons lived in a mobile home on a five acre property owned by the landlord, who lived in another mobile home situated above the victim's. Defendant had been staying with the landlord in the latter's mobile home for eight months and the victim assumed that defendant was in a relationship with the landlord. To

---

[2] Actually, section 243, subdivision (d) punishes *battery* causing serious injury, but the jury here was told, by stipulation of the parties, that it was *assault* causing serious injury.

the victim's knowledge, she and defendant had had an amicable relationship and the victim spoke to defendant two times a week. However, defendant often asked the victim about the victim's relationship with the landlord, who was a long-time platonic friend of the victim's and the victim thought it might be an indication of jealousy on the part of defendant, so she stayed away from defendant. On April 22, 2011, the victim and one of her sons were returning from work and the market, when the victim dropped her son off at the gate so the latter could open and close it for his mother. The victim was driving a car belonging to another man who lived in another trailer on the property, which the victim routinely drove twice a week. The victim parked the car in the only place she ever parked it, got out and turned around. Defendant walked from the tool shed towards the victim. The victim said hello to the defendant and asked her how she was. Defendant asked the victim if the latter had everything she needed, and defendant did not seem angry or upset. The victim said no, that she had to get her groceries out of the back seat of the car. The victim turned to open the back car door, got her purse out and put it on top of the car, then turned around to face defendant. Defendant hit the victim in the face with a closed fist, causing the back of the victim's head to hit the top of the car. The victim said, "What the fuck, Mickey," (the name by which the victim called defendant). Defendant hit the victim's face a second time, and the victim went to the ground, covered her face with her hands and screamed for her son. She laid face down with her hands over the back of her head. Defendant delivered what the victim, at the time, believed were kicks to the victim's sides, breasts, head, face and the backs of her arms. She was

4

struck between 20-25 times while on the ground. The victim's son and the owner of the car that the victim had been driving came and told defendant to stop. The victim's son tried to keep defendant off the victim. The car owner took the victim to the nearest fire station, where the victim was told that she had been stabbed, not just hit. She had approximately 16 stab wounds.

The victim's son testified in corroboration of that portion of his mother's testimony that he witnessed, and he added that after he had pulled defendant off his mother, he and defendant struggled with each other for over five minutes, as defendant resisted him. The son also testified that defendant had in her hands a six-to-eight inch long screw driver, which the son unsuccessfully tried to get from defendant. After the car owner had told defendant to stop assaulting the victim, defendant still had the screwdriver in her hands. The son testified that the landlord kept most of his tools in the tool shed which was in the direction from which the victim had seen defendant walk. The son also said that the attack occurred in the early afternoon.

The car owner testified that the victim used his car the same two days per week to go to work, usually returning it at 1:30 or 2:00 p.m. He also said that the screwdriver defendant used was about four-to-five inches long, without the handle, and he had seen the victim's son trying to pull defendant off the victim during the attack. Before the victim and her son had arrived at the property, defendant had been outside.

The landlord testified that he had had an intimate relationship with defendant, who had been homeless when they met, but they had ceased being intimate four-to-five

5

months into the relationship, and, at the time of the crime, they "just tolerated" each other. He recalled that the victim was nervous when interacting with defendant. On three or four occasions, defendant had asked the landlord about his relationship with the victim and the landlord had told defendant that they had never been intimate and they never would be—that they were just long-time friends. Defendant would insist that the two must be "doing something" and sometimes the landlord would jokingly say that they were, but then would retract the statement because defendant would insist that that was the case. Three days before the crime, the landlord told defendant that when he got paid on April 22, he would give defendant money, but defendant had to leave. The landlord feared that if defendant continued to live with him, violence would occur—whether by him or by defendant. On two or three occasions, he and defendant had argued and been verbally aggressive with each other. On April 22, they had agreed that the landlord would drive defendant to Venice Beach when he got off work. The landlord intended to give defendant money. As he drove onto his property, he passed the car in which the car owner was driving the victim to the fire station. The victim reported to the landlord that defendant had just "kicked the shit out" of her. The landlord then asked the victim's son if the victim was going to press charges against defendant, as he was about to drive defendant to Venice Beach. He thought the victim had just been beaten; he did not realize she had also been stabbed. While the landlord and defendant were en route to Venice Beach, the police told the son to have defendant returned to the landlord's property. The landlord was going to turn around and drive defendant back, but defendant

6

asked the landlord to drop her off where they were, outside a restaurant, and the landlord complied. The landlord testified that most of the time, he kept the majority of his tools in the tool shed; sometimes, tools were just lying around the property.[3]

The trial court ruled that the evidence of the attack on the Hollywood victim was admissible to show premeditation. The court reasoned that the evidence was not cumulative on this issue as the only other evidence of premeditation was that defendant may have gotten the screwdriver out of the tool shed before approaching the victim, but no one knew for certain whether defendant, even if she came from the tool shed, got the screwdriver from there. The court noted the following similarities between the instant crime and the attack on the Hollywood victim: (1) both victims were elderly females, (2) defendant approached both from behind, (3) defendant got the attention of both victims, the instant victim, by talking to her and the Hollywood victim by tapping her on the shoulder, (4) the first blow was to the right side of the victim's face, stunning and temporarily disabling each, (5) a brutal beating followed, (6) others had to intervene to stop the attack, (7) the attacks were two days apart and (8) there was eye contact between the Hollywood victim and defendant and defendant waited for the instant victim to return

---

[3] This testimony was introduced before the trial court made its now contested ruling on the admission of evidence. The only evidence that followed that ruling was testimony by the doctor as to the victim's injuries and the testimony of a sheriff's investigator concerning a screwdriver that was found two days after the crime, but could not positively be identified as the one used by defendant, pictures of the victim's wounds, and the fact that the victim had not told the investigator that defendant approached her and that he did not recall the victim telling him that defendant came from the tool shed.

to the property, both indicating planning. The court further found that Evidence Code section 352 did not require exclusion. Before the Hollywood victim testified, the trial court instructed the jury that it could, but was not required to, use this testimony only if it determined, by a preponderance of the evidence, that defendant committed the attack on the Hollywood victim, and, if so, only in deciding whether defendant "acted with premeditation and deliberation" and for no other reason. The jury could not use the evidence to conclude that defendant had a bad character or was disposed to commit a crime. The court further instructed the jury that it was to consider the similarities between the prior and current incidents. Finally, the jury was told that the evidence of the prior incident was only one factor to consider and it was insufficient by itself to prove that defendant was guilty of attempted murder with premeditation and deliberation. This instruction was repeated at the end of trial. The jury was instructed that if it found defendant guilty of attempted murder, it was to decide if the People had proved, inter alia, that the attempted murder was done with deliberation and premeditation. The instruction went on to provide, "The defendant deliberated if [she] carefully weighed the considerations for and against [her] choice and, knowing the consequences, decided to kill. [She] premeditated if [she] decided to kill before acting. [¶] . . . [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

Defendant here contends that the trial court abused its discretion (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004) in admitting the testimony of the Hollywood

8

victim, which tracked her section 402 hearing testimony, summarized above. She begins her attack by asserting that evidence that the crime involving the Hollywood victim was premeditated was lacking. We disagree.

Preliminarily, defendant gets it wrong by asserting that the evidence of the Hollywood incident was admitted to show that she "had a deliberate and premeditated intent to kill [that victim, therefore] the jury could infer . . . a deliberate and premeditated intent to kill [the instant victim]."[4] The jury was never told what the intent element was for the assault causing the Hollywood victim serious bodily injury. Ultimately, the trial court said it was "focused on premeditation, not necessarily intent to kill." As we already stated, the trial court admitted the evidence only to show premeditation and the jury was so instructed.

Defendant asserts that the evidence did not show premeditation. We disagree. The Hollywood victim testified that defendant saw her before she went into the store to purchase a belt. Her testimony created a reasonable inference that defendant hung around until she came out of the store, then assaulted her.[5] This suggests premeditation and deliberation.

---

[4] It also contradicts defendant's assertion, made earlier in her brief, that the evidence was admitted "for the purpose of showing premeditation . . . ."

[5] In fact, during her trial testimony, the Hollywood victim testified that she was in the store for 15-20 minutes. Although the trial court did not have the benefit of this testimony when it ruled on the admissibility of the evidence, it would have been reasonable for the court to infer that the Hollywood victim was inside the store for more than just a few minutes, selecting and purchasing a belt.

Defendant asserts that the fact that she tapped the Hollywood victim on the shoulder before beginning her assault on her did not suggest premeditation. Again, we disagree. The tapping on the shoulder suggested that defendant had planned what she intended to do to the Hollywood victim—and she wanted the victim to be fully aware that it was she, and no one else—who was assaulting the victim. That, as the trial court found, indicated planning and premeditation.

Defendant contends that the evidence of the attack on the Hollywood victim did not show an intent to kill her, motive, absence of mistake or accident or common design or plan and she points out that the trial court agreed with her as to each point. Because the evidence was not admitted for any of those purposes, and there is really nothing for us to address because defendant agrees with the trial court's rulings on each matter, defendant could have saved 12 or 8 pages of briefing and this court's time by saying nothing about these matters.

Defendant contends that two cases the trial court relied upon in admitting the evidence do not support its admission. The trial court appeared at times in its tortured journey on this issue to be persuaded by *People v. Walker* (2006) 139 Cal.App.4th 782 (*Walker*) and *People v. Sully* (1991) 53 Cal.3d 1195 (*Sully*).

In *Sully*, the California Supreme Court held that evidence of the imprisonment and sexual assault of one surviving victim and the imprisonment and assault of another was admissible on the issue of the defendant's intent as to the charged first degree murders of still other victims. (*Sully*, *supra*, 53 Cal.3d at pp. 1224-1225.) The *Sully* court did not

10

specify for what intent—whether it was the intent to kill or premeditation and deliberation or both, the evidence was admissible. *Walker*, while noting that the fact that the victims of the charged offense were murdered while the victims in the section 1101, subdivision (b) evidence were not "does not negate the similarity of the two incidents," cited *Sully*'s holding as to similarities necessary for admission of evidence to prove identity and intent. (*Walker*, *supra*, 139 Cal.App.4th at pp. 804-805.) Contrary to the assertion of defendant, *Walker* did not explicitly hold that the section 1101, subdivision (b) incidents demonstrated an intent to kill by the defendant that was relevant to the charged murders, only that the section 1101, subdivision (b) evidence was admissible on the issue of intent, i.e., *to negate mistake or accident in the charged offenses*. (*Id*. at p. 803.) We agree with defendant that neither *Sully* nor *Walker* is especially helpful to this case, but for reasons other than those advanced by defendant, except to the extent both endorsed the position that the fact that the section 1101, subdivision (b) victims were not killed and the instant victims were does not detract from whatever other similarities exist between the two sets of crimes. To whatever extent the trial court relied on either or both of these cases, "' . . . we review the ruling, not the [trial] court's reasoning, and, if the ruling was correct on any ground, we affirm.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 582.) Hence, even if we agreed with defendant that the *Sully* and *Walker* cases did not support the trial court's ruling, as long as *Sully*, which govern us, does not

11

mandate an outcome other than that arrived at by the trial court,[6] any reliance by the trial court on either or both is immaterial.

Defendant also asserts that the prejudicial effect of the evidence outweighed its probative value. Again, we disagree. As defendant states, we examine the strength of the evidence to demonstrate premeditation and deliberation, whether the source of the evidence of the Hollywood incident is independent of the charged offense, whether the Hollywood incident resulted in a conviction and the time span between the two. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.) We have already concluded that the evidence demonstrated premeditation and deliberation. The three remaining factors were also met here. We agree with the People that the attack on the Hollywood victim, though shocking, mainly because it involved someone defendant did not even know, and thus, seemed to lack a rational motive, was not as horrendous as the attack on the instant victim. The testimony of the Hollywood victim took very little time, there was no basis for the jury to confuse one incident with another, and the fact that the defendant was already being punished for the Hollywood incident meant that the jury did not have to convict her of this crime in order to punish her for the former. We reject defendant's assertion that the jury somehow knew that defendant had not quite been punished sufficiently for the attack on the Hollywood victim by being convicted of assault causing serious bodily injury and convicted her of the instant offense to assure that punishment.

---

[6] Defendant asserts only that *Sully* and *Walker* "do not . . . establish that the [§ 1101, subd. (b)] evidence . . . was properly admitted in [this] case."

Having concluded that admission of the evidence was proper, we necessarily reject defendant's assertions that her right to a fair trial was violated.

Finally, even if, by some stretch of the imagination, we could criticize the trial court for admitting this evidence, we could not say that under any standard, reversal of defendant's conviction would be appropriate. As defendant, herself, concedes here and did below, the evidence that she viciously attacked the instant victim was overwhelming. All that remained for the People to prove was that she acted with the intent to kill the victim and, *having already determined that defendant had that intent*, that defendant carefully weighed the considerations for and against, and knowing the consequences, decided to kill and that she decided to kill before acting. Defendant's intent to kill the victim was well established by evidence of the brutality of the attack on the victim, and more specifically, the testimony of the doctor who treated the victim that the latter sustained injuries where her vital organs were. Thus, there was very strong evidence of the intent to kill. As to the remaining issue of whether there was premeditation and deliberation for which the evidence in question was admitted, the fact that defendant armed herself with a screwdriver and a reasonable inference could be drawn that she went outside and waited for the victim to return from work, said things designed to disarm the victim, then attacked her, showed premeditation and deliberation, as did her apparent lack of anger or upset just before beginning the attack. Additionally, the fact that defendant had to be physically restrained in order to stop the attack, and no one testified that she appeared shocked by what had transpired, or offered any explanation or apology for her

13

actions, further supported both. Also, the fact that defendant attacked the victim, knowing that the latter's son and the car owner were nearby, and continued the attack even after the victim called out for her son and the son tried to pull defendant off his mother, betrayed a singularity of purpose which the jury could reasonably infer had been premeditated and deliberated. Thus, there was very strong evidence of both. Defendant offered no contrary or ameliorative evidence or explanation at trial for her behavior.

2. *Jury Instruction on Section 1101, subdivision (b) Evidence*

Defendant takes issue with the instruction given the jury that it could conclude she committed the crime involving the Hollywood victim by a preponderance of the evidence. She argues that it permitted "some facts essential to the jury's finding of guilt . . . to have been proved to a standard less than beyond a reasonable doubt." Again, we disagree. The jury was required, both by the instruction given, already restated above,[7] as to the section 1101, subdivision (b) evidence and by another instruction given to find deliberation and premeditation beyond a reasonable doubt.

Although defendant calls our attention to *People v. Loy* (2011) 52 Cal.4th 46 (*Loy*), nothing in that opinion supports her position—in fact, it supports a contrary conclusion. In *Loy*, the California Supreme Court concluded that the instruction on section 11*08* evidence "could have been better" but "did not mislead the jury in any fashion prejudicial to defendant." (*Id*. at p. 77.) The instruction told the jurors that if

---

[7] See text on page nine.

14

they could find, by a preponderance of the evidence (which was not defined), that defendant committed a prior sexual offense, they could, but were not required to, infer that defendant had a disposition to commit the same or similar type of sexual offense, and if that inference was made, they could, but were not required to, infer that defendant was likely to *and did commit* the charged sexual offense. (*Id.* at p. 71.) The high court rejected defendant's contention that this instruction informed the jurors that they could convict defendant of the charged murder solely on the evidence of the prior sexual offense, violating the requirement of proof beyond a reasonable doubt. (*Id.* at pp. 72, 76.) The court reasoned, "[T]he instructions never told 'the jury it may rest a conviction solely on evidence of prior offenses.' [Citation.] . . . [B]ecause of the instructions the jury heard concerning the reasonable doubt standard of proof, '[n]o reasonable juror would believe those requirements could be satisfied solely by proof of uncharged offenses.' [Citation.] . . . [¶] . . . [¶] The instruction merely told the jury it could 'infer' from defendant's prior sexual crimes that he committed the charged crime. It did not say such an inference itself constituted proof beyond a reasonable doubt. The jury was also instructed that 'an inference is a deduction that can logically and reasonably be drawn from another fact or group of facts established by the evidence.' [Citation.] But a *logical deduction* is not the same as *proof beyond a reasonable doubt*. . . . The instructions given 'provide only that an inference of guilt *may be drawn* from prior offenses that have been proved by a preponderance of the evidence. They do *not* suggest that an inference so drawn is *sufficient* for a *finding* of guilt. [Citations.] The jury still had to find that the

15

facts of the charged crime had been proved beyond a reasonable doubt. [Citation.] [¶] Reviewing the instructions in this case as a whole bolsters this conclusion. . . . [T]he court instructed repetitively and in detail on the reasonable doubt standard. . . . [T]he court also instructed the jury there had to be a union or joint operation of act or conduct and the required intent." (*Id*. at pp. 74-76.) The same was the case here. The high court in *Loy* also rejected the defendant's argument that the instruction permitted the jury to convict him based on the preponderance of the evidence standard applicable to the section 1108 evidence, rather than on the proof beyond a reasonable doubt standard, saying, "The [trial] court merely told the jury it could not consider the evidence of the prior sexual crimes for any purpose unless it found that he had committed them by a preponderance of the evidence. Nothing in that instruction cancelled the reasonable doubt instruction . . . ." (*Id*. at p. 76.)

Defendant here asserts that "some facts essential to the jury's finding of guilt may have been found by the jury to have been proved to a standard less than beyond a reasonable doubt. [¶] . . . [¶] . . . [I]f the jury is allowed to consider [§ 1101, subd. (b)] evidence that has been proved by no more than a preponderance of the evidence, and that . . . evidence actually influences the jury's determination that the charges are true, then necessarily a link essential to the chain has not been proved to the constitutionally-mandated standard of proof beyond a reasonable doubt." To be frank, many things can influence a jury's determination of the charges, for example, the credibility of witnesses, including testifying defendants. However, credibility determinations are the exclusive

province of the jury and are not subject to the proof beyond a reasonable doubt requirement. As the California Supreme Court held in *People v. Rogers* (2013) 57 Cal.4th 296, 338, "It is well settled that evidence of other crimes presented in the guilt phase of a criminal trial may be proved by a preponderance of the evidence. [Citations.] 'Prior cases explain that the facts tending to prove the defendant's other crimes for purpose of establishing his criminal knowledge or intent are deemed mere "evidentiary facts" that need not be proved beyond a reasonable doubt as long as the jury is convinced, beyond such doubt, of the truth of the "ultimate fact" of defendant's knowledge or intent. [Citation.]' [Citation.]"

### DISPOSITION

The trial court is directed to amend the abstract of judgment to show that: (1) defendant was not convicted of attempted second degree murder, as it currently states; (2) defendant was convicted by a jury, not that she pled guilty, as the abstract currently states; (3) she was sentenced to a life term, not a term of seven years to life, as the abstract currently states and, (4) the enhancement for use of a deadly weapon was pursuant to section 12022.7, subdivision (a), not section 12922.7, subdivision (a) as the abstract currently states. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

KING
J.