Filed 5/7/21  P. v. Juarez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUCAS JUAREZ,<br><br>    Defendant and Appellant. | H045680<br>(Santa Clara County<br>Super. Ct. Nos. C1649990, 215110) |

A jury convicted defendant Lucas Juarez of actively participating in a criminal street gang (count 1; Pen. Code, § 186.22, subd. (a)[1]) and resisting, delaying, or obstructing an officer (count 2; § 148, subd. (a)(1)).  The jury found that count 2 was committed for the benefit of a criminal street gang (§ 186.22, subd. (d)), and defendant admitted he had suffered a prior serious felony conviction (§ 667, subd. (a)) that qualified as a "strike" (§§ 667, subds. (b)-(i), 1170.12).  In a separate case, defendant pleaded no contest to first degree burglary (§§ 459, 460, subd. (a)) and admitted that he committed that offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)).

After granting defendant's motion to dismiss the "strike" allegation, the trial court imposed an aggregate prison term of seven years eight months.

On appeal, defendant contends:  (1) this court must conduct an independent review of the in camera hearing held pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531; (2) his conviction of actively participating in a criminal street gang is not supported

---

[1] Unspecified section references are to the Penal Code.

by substantial evidence; (3) the trial court abused its discretion by admitting evidence that defendant previously possessed methamphetamine in jail; and (4) this court must remand the matter so the trial court can exercise its discretion to dismiss the prior serious felony allegation (§ 667, subd. (a)) pursuant to Senate Bill No. 1393 (2017-2018 Reg. Sess.).

After independently reviewing the transcript of the in camera *Pitchess* hearing, we find the trial court did not abuse its discretion with regard to its disclosure order. We find that substantial evidence supports defendant's conviction of active participation in a criminal street gang. We find no abuse of discretion in the trial court's admission of defendant's prior uncharged act of possessing methamphetamine in jail. However, we will reverse the judgment and remand the matter for resentencing so the trial court can determine whether to dismiss the prior serious felony allegation (§ 667, subd. (a)).

## I.     BACKGROUND

### A.    *Charged Incident*

On August 18, 2016, deputies were assigned to conduct a security check of unit 7-B in the Santa Clara County Main Jail. The search was focused on looking in Norteño inmates' cells, based on information that inmates had a cell phone and "[k]ites"—i.e., notes written in "microwriting." When the deputies entered the unit, an inmate shouted, "tornado, shakedown," to warn other inmates.

Deputy Corey Evans approached cell No. 18, where defendant and Matthew Aburto were inmates. Defendant and Aburto had their hands tucked into their waistbands. Deputy Evans ordered them to take their hands out and face the wall. As Deputy Evans entered the cell, defendant and Aburto took their hands out. Aburto "started fumbling with something" on one of the bunks. Defendant turned his back to the deputy, then turned back around to face the deputy, with his hands raised. Deputy Evans thought defendant was going to lunge towards him, so he took defendant to the ground.

Deputy Gabriel Hernandez, Jr., heard a "commotion" from the cell No. 18 area. He saw Deputy Evans struggling on the ground with defendant. When Deputy

2

Hernandez ran over, Aburto began running out of the cell. Deputy Hernandez grabbed Aburto, pulled him down to the ground, and held him down until additional deputies arrived.

Either defendant or Aburto had flushed the toilet when Deputy Evans entered. A search of the toilet revealed wet pieces of paper that turned out to be kites. Kites were also found in other areas of the cell: around the toilet area, on top of the sink, inside the sink, underneath both bunk mattresses, on the desk, and underneath the desk. Most of the kites were tightly wrapped in cellophane.

## B. *Uncharged Incident*

On January 20, 2016, Deputy Dale Nelson was assigned to assist with transporting jail inmates to and from the courthouse. He heard a group of inmates yelling, and he decided to search them to determine if they had weapons or drugs. Deputy Nelson did a strip search of defendant, which revealed that defendant had a baggie of methamphetamine in his rectum.

## C. *Gang Evidence*

### 1. *Expert Testimony: Nuestra Familia*

Campbell Police Sergeant Dan Livingston testified as an expert on the Nuestra Familia organization. The Nuestra Familia formed in California's prison system in the 1960's, in response to actions by the Mexican Mafia. In about 1972, the Nuestra Familia gang became "formalized," with a "rank structure" and a "constitution." In the 1980's, there was a restructuring that resulted in the formation of the Nuestra Raza (NR), the group below the "NF" rank. "Everybody below that" is a Norteño or Northerner.[2] Norteños include members of subsets such as Capitol Park and Warloch.

The Nuestra Familia organization is very "regimented." Norteños who are in jail must follow specific schedules and rules, including the rule that they must "jump in" if

___

[2] At trial, the terms "Norteño" and "Northerner" were often used interchangeably. For consistency, we will use the term Norteño.

there is an assault.  In order for Norteños to move up the ranks, they are trained in tasks including how to make weapons.  Other activities that benefit the Nuestra Familia organization include jail assaults and carrying weapons in jail.

The Nuestra Familia organization's communication is often done through kites. Kites may be rolled up really tight and wrapped in plastic, and they may be placed in an inmate's rectum in order to prevent guards from finding them.

When a Norteño enters county jail, he or she will be put on "freeze" until there is a determination of the person's status.  Once the person is "cleared," he or she will be given responsibilities, which may include being asked to hold drugs, kites, and weapons.

Nuestra Familia gang members identify with the number 14, the color red, and the term "Norte" (Spanish for "north").  The primary activities of the Nuestra Familia organization are murder, assault with a deadly weapon, drug sales, possession for sale of controlled substances, extortion, witness intimidation, kidnapping, firearms possession, arson, terrorist threats, grand theft, transfer or sale of firearms, robberies, forgery, and identity theft.

### 2.	*Expert Testimony:  Norteño Gangs*

San Jose Police Officer Gabriel Cuenca testified as an expert in Norteño gangs. According to Officer Cuenca, the Nuestra Familia organization is the "umbrella group" for Norteño gang members.  Norteño gang subsets in San Jose include Capitol Park Locos and Warloch, which are "sister gangs" that "work together."  Norteño gang members identify with Nuestra Familia signs and symbols, but they may also use the particular signs and symbols of their subset.

San Jose Police Officer John Van Den Broeck also testified as an expert on Norteño gangs.  Officer Van Den Broeck explained that "the Norteño gangs in San Jose are associated with the NF, the Nuestra Familia."  Although the Nuestra Familia "is primarily a prison gang," its members use "Norteños who are on the street to facilitate what they want to get done."

4

### 3. *Former Gang Member Luis Barrios*

Luis Barrios testified under a grant of use immunity. He had grown up in San Jose around many Norteño gang members, including people who "sided with the NF," and his involvement with Norteño gang members grew as he moved to the Sacramento area, spent time in custody, and returned to San Jose. When the Nuestra Familia learned that Barrios was selling large quantities of drugs "under their noses," Barrios agreed to "help out" when he was needed. Barrios worked with a friend who was part of the Nuestra Familia "regiment"—people who help the Nuestra Familia out on the streets.

At some point, Barrios ended up in jail in Santa Clara County, charged with attempted murder. There, he was trained by a Nuestra Familia member and educated by some Nuestra Raza members. Barrios then became part of the "chain of command" of the Nuestra Familia. Barrios ultimately became a Nuestra Raza member and the regimental leader in Santa Clara County.

At the top of the chain of command is a person designated as the chain (C), a Nuestra Familia member who is the "ultimate authority." Below the C there are several authorities in charge (AIC's), each of whom is in charge of a specific area in the jail. The AIC's disperse directives from the Nuestra Familia and work with a northern teacher (NT), who teaches other gang members, and the squad leaders (SL's), who are responsible for carrying out "hits" and must be trained in weapon use.

Barrios's initial assignments included relaying messages, which he did through kites. Kites usually were passed through "an established route." Once someone is entrusted with a kite, they are not allowed to give it to a correctional officer. Swallowing kites and flushing them down a toilet are ways to keep kites from correctional officers.

Being part of the movement of a kite does not necessarily mean that the person with the kite is "privy to the information" in the kite. Kites can describe "a hit on somebody," report on "drugs coming in," or contain an updated summary on which gang

5

members are in the jail. No matter the content of the kite, it must be treated with "utmost security." When kites are secreted anally, it is called "hooping."

A Norteño is not given authority to handle kites unless he has been "fully cleared." Clearance involves answering a questionnaire, being screened against the "Bad News List," and a further application. The application has questions asking if the person is willing to perform certain functions such as using a weapon or handling kites. A person who is not actively participating in the Nuestra Familia organization would not receive a kite.

4.      *The Kites*

Barrios explained the meaning of some of the kites found in defendant and Aburto's cell. One kite was dated as "revised 2016" and addressed "to all" from the AIC. The kite was denoted as an "abreastment," which is meant to "let everybody that's cleared know something that's going on." The kite described how some "Sols" (i.e., members of the "northern collective") were being "negligent" in how they stored weapons. The kite explained that any weapon that is "hoopable" should be "secured in the anal cavity." The kite described how someone would train their body to store a kite in his anus and how to remove it. The kite noted that Norteños are not required to carry weapons, but that carrying a weapon is a way to achieve "advancement" and show the higher-up gang members "where you stand."

A second kite from the AIC was addressed to "all pintas," meaning "to all prisons," and also denoted its message as an "abreastment." The kite described how a "Raza" had killed a Sureño in a state prison, and how there was likely to be "retaliation" and "a war." The kite contained a second message informing anyone who was going to be transferred to Corcoran State Prison that they should "enter with extreme caution and [be] battle ready."

A third kite from the AIC was addressed to FCMP, which stands for facility manpower, and was dated as "revised 2016." The kite stated that some "unsuitable"

6

conduct had been noticed, including "set tripping," which is when a member of one gang subset has a conflict with a member of another gang subset in the jail, where all Norteños are supposed to function together. The kite instructed all Norteños to consider themselves "one collective" within the Nuestra Familia organization.

A fourth kite was also an "abreastment" from the AIC and dated as "revised 2016." The kite gave instructions on how to "ensure our materials are not lost, fumbled, or flushed, which there's no excuse for." The kite explained that "if you are asked to hold something and you have no desire to do [it]," "then simply tell us that you can't do it as it saves all included from added situations." The kite provided detailed instructions on how a person should retrieve an item that the person was carrying in their anus, to prevent it from going down the toilet.

A fifth kite was another "abreastment" from the AIC. The kite specified how Norteños should and should not wear their hair. The kite also specified that Norteños should not be recruiting people for their own specific neighborhoods while in jail.

A sixth kite was dated April 2016 and addressed "to receiving facility." The kite provided "clearance" regarding a person who was leaving for another jail, and described the "group factions" on each floor of the jail.

A seventh kite was dated August 17, 2016 and addressed to a specific person, in code, from "La Casa." The kite chastised the person for being at a program "without a buddy," reminded the person that the buddy system is to be used even when there does not seem to be a threat present, and ordered the person to write a 500-word essay on "the importance of security measures and the consequences if we fail to abide them."

An eighth kite was dated as "Revised 2016" and addressed from the AIC to the "F/C HHMs," meaning "facility household members." The kite warned of housing changes in the jail that resulted in Sureños, as well as "trash and degenerates" (i.e., gang dropouts) being placed in "N households." The kite told all "Sols" to "be security

7

oriented" and that if "your brother next to you engages, you are to stand next to him in battle."

Barrios explained how writing a kite is "time consuming" because "you have to be legible and it has to be clear." A person with good eyesight could read a kite despite the very small writing, although some people would need reading glasses to magnify the kite. If a person was carrying a kite in his mouth, he would pass it by spitting it into his hand and placing it into the recipient's hand during a handshake.

5.    *Predicate Offenses*

In October 2016, Brandon Bracamonte was convicted of five counts of second degree robbery (§§ 211, 212.5, subd. (c)), active participation in a criminal street gang (§ 186.22. subd. (a)), conspiracy to commit robbery (§§ 182, subd. (a)(1), 211, 212.5, subd. (c)), and attempted second degree robbery (§§ 664, 211, 212.5, subd. (c)). Criminal street gang allegations (§ 186.22, subd. (b)) were found true as to the robbery, conspiracy, and attempted robbery counts. Detective Livingston believed that when Bracamonte committed those crimes, he was a member of the Nuestra Familia organization—specifically, "a Varrio Franklin Boulevard gang member functioning in an NF street regiment."

In May 2017, Leonard Rodriguez was convicted of being a felon in possession of a firearm (§ 29800, subd. (a)(1)), conspiracy (§ 182, subd. (a)(1)), and possession of an assault weapon (§ 30605, subd. (a)), all with criminal street gang allegations found true (§ 186.22, subd. (b)). Detective Livingston believed Rodriguez was a member of the Nuestra Familia organization—specifically, a Nuestra Raza member—based on his gang tattoos as well as gang-related items and contraband found at his residence during a search in November 2012.

6.    *Prior Gang Activity by Defendant and Aburto*

In October 2012, Aburto was found on a closed high school campus. Aburto was writing graffiti on a wall with a large Sharpie. Aburto had written "Norte" and was writing more when he was stopped.

In May 2013, police contacted defendant, along with David Collazo. Defendant was wearing red and black shoes and a red belt. Collazo had a "four dots" tattoo on his arm.

In February 2014, police stopped a vehicle in which Aburto was the passenger. Enrique Moran and Michael Flores were also in the vehicle. Aburto admitted he was a "Northerner," that he had a gun underneath the seat, and that he had more guns at his residence. A search of Aburto's residence revealed several guns as well as red clothing.

During the February 2014 incident, the police located a cell phone in the vehicle. The cell phone contained photographs of Aburto with different guns. The cell phone also included photographs of Aburto, defendant, Moran, and other known gang members displaying gang signs, wearing red clothing, and showing off their gang tattoos. One photograph showed Aburto displaying a "San Jo" tattoo on his chest while wearing red shorts. In another photograph, Aburto and Moran were both making gang signs associated with the Capitol Park Locos subset. Other photographs showed Aburto with a baseball cap associated with the Warloch subset and a jersey associated with the Capitol Park Locos subset. Another photograph showed defendant holding two firearms while in the company of someone else who was holding two firearms and displaying the Warloch subset's hand sign.

In September 2014, police responded to a burglary report and detained defendant. At the time, defendant's tattoos included "NS" on his knee and "WL" on his chest. Other suspects included Jesse Gonzales and Enrique Moran. Defendant subsequently "pled to and was convicted of a residential burglary and admitted a gang enhancement." Gonzales and Moran also sustained convictions relating to the burglary.

9

*7.     Expert Opinions*

Officer Cuenca was provided a hypothetical concerning Aburto that mirrored the facts of the October 2012 graffiti incident and the February 2014 car stop. Officer Cuenca opined that Aburto was a member of the Norteño gang in San Jose.

Officer Van Den Broeck opined that defendant was a Norteño gang member, based on "the totality of the circumstances," which included defendant's gang tattoos, defendant's association with other gang members, and photographs of defendant displaying gang hand signs.

Detective Livingston opined that defendant and Aburto were both members of the Nuestra Familia organization at the time of the charged incident in the jail. Given a hypothetical mirroring the facts of the incident, Detective Livingston opined that the actions of defendant and Aburto were committed for the benefit of, at the direction of, and in association with the Nuestra Familia organization. Detective Livingston further opined that the actions of defendant and Aburto would promote, further, or assist criminal conduct by gang members.

## D.     *Verdicts and Sentence*

The jury found defendant guilty of actively participating in a criminal street gang (count 1; § 186.22, subd. (a)). The jury found defendant not guilty of resisting an executive officer by means of force (count 2; § 69), but found him guilty of the lesser-included offense of resisting, delaying, or obstructing an officer (§ 148, subd. (a)(1)). The jury found that count 2 was committed for the benefit of a criminal street gang, making it a felony (§ 186.22, subd. (d)). Defendant admitted he had suffered a prior serious felony conviction (§ 667, subd. (a)), which qualified as a "strike" (§§ 667, subds. (b)-(i), 1170.12).[3]

---

[3] Aburto was likewise convicted of active participation in a criminal street gang (§ 186.22, subd. (a)) and resisting, delaying, or obstructing an officer (§ 148, (continued)

10

The trial court imposed the low term of 16 months for count 1 (active participation in a criminal street gang). For count 2 (resisting an officer, with a gang enhancement), the trial court imposed a concurrent low term of one year. The trial court imposed a five-year consecutive term for the prior serious felony enhancement.

In a separate case (No. 215110) defendant pleaded no contest to first degree burglary (§§ 459, 460, subd. (a)) and admitted that he committed that offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(B)). In that case, the trial court dismissed the gang allegation and imposed a consecutive one year four month term.

Defendant's aggregate prison term was seven years eight months.

## II.    DISCUSSION

### A.    *Pitchess Review*

Defendant contends this court must conduct an independent review of an in camera *Pitchess* hearing held by the trial court. The Attorney General does not object to this court conducting such a review.

#### 1.    *Proceedings Below*

Defendant filed a *Pitchess* motion seeking materials from the personnel file of Deputy Evans. In a declaration, defendant's trial counsel asserted that Deputy Evans had made material misstatements in his report, including a description of how defendant had advanced towards the deputy with his hands up and how defendant had positioned himself in a "bladed stance."

The trial court granted defendant's *Pitchess* motion as to two categories of complaints about Deputy Evans: the preparation of false or misleading police reports and the use of excessive force. After an in camera hearing, the trial court ordered disclosure of "some information," subject to a protective order.

---

subd. (a)(1)). Aburto was also convicted, by plea, of carrying a concealed firearm (§ 25400, subd. (a)(3)), which stemmed from a separate incident.

11

### 2. *Legal Standards*

The *Pitchess* discovery procedure has two steps. First, the party seeking discovery must file a written motion describing the type of records sought, supported by "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records." (Evid. Code, § 1043, subd. (b)(3); *People v. Mooc* (2001) 26 Cal.4th 1216, 1226 (*Mooc*).) Second, if the superior court finds good cause for discovery of personnel records, the court conducts an in camera review of the pertinent documents to determine which, if any, are relevant to the case, typically disclosing only identifying information concerning those who filed complaints against the officers. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019.) "The trial court may not disclose complaints more than five years old, the 'conclusions of any officer' who investigates a citizen complaint of police misconduct, or facts 'so remote as to make [their] disclosure of little or no practical benefit.' " (*Ibid.*) Even upon a showing of good cause, the defendant is only entitled to information that the court, after the in camera review, concludes is relevant to the case. (*People v. Johnson* (2004) 118 Cal.App.4th 292, 300.)

When the superior court conducts the in camera review, it must make a record that will permit future appellate review. (*Mooc*, *supra*, 26 Cal.4th at pp. 1229-1230; *People v. Guevara* (2007) 148 Cal.App.4th 62, 69.) The court may copy the documents and place them in a confidential file, prepare a sealed list of the documents it reviewed, or "simply state for the record what documents it examined" and seal that transcript. (*Mooc*, *supra*, at p. 1229.)

The trial court's determination of whether confidential personnel records are discoverable is subject to review for abuse of discretion. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.) If there is any uncertainty in the record as to which documents were

12

reviewed by the trial court, this court may remand the matter to the trial court with directions to conduct a hearing and clarify the materials it reviewed in camera before it denied the *Pitchess* motion. (*Mooc*, *supra*, 26 Cal.4th at p. 1231.)

### 3. *This Court's Review*

We have independently reviewed the sealed reporter's transcript of the in camera hearing regarding the *Pitchess* discovery of Deputy Evans's personnel records. The record is sufficient to permit appellate review, and we conclude the trial court properly exercised its discretion in ordering the disclosure it did.

## B. *Sufficiency of the Evidence*

Defendant contends his conviction of actively participating in a criminal street gang (§ 186.22, subd. (a)) is not supported by substantial evidence that he willfully promoted, furthered, or assisted in any felonious criminal conduct by members of the gang.

The Attorney General asserts there is substantial evidence to support the People's theory of the case: that defendant's felonious conduct was his participation in a "conspiracy to possess weapons in county jail."

Defendant asserts that the evidence supporting such a conspiracy consisted only of his possession of the kites and his attempted destruction of the kites. Defendant contends there was no evidence that he was aware of the contents of the kites, and that the jury could have found he merely possessed the kites in order to pass them to other people. Defendant argues that without evidence that he had either read or written the kite about securing weapons, the jury could not have found that he entered into an agreement to possess weapons in a penal institution.

### 1. *Jury Instructions*

The jury was instructed on the elements of active participation in a criminal street gang pursuant to CALCRIM No. 1400. In pertinent part, the instruction stated:

13

"The defendants are charged in Count 1 with participating in a criminal street gang in violation of Penal Code Section 186.22 subsection (a). [¶] To prove that a defendant is guilty of this crime, the People must prove that: [¶] One, the defendant actively participated in a criminal street gang, the Nuestra Familia Organization; two, when the defendant participated in the gang, he knew that members of the gang engaged in or have engage in a pattern of criminal gang activity; and, . . . [¶] Number three, the defendant willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang by directly and actively committing a felony offense. [¶] . . . [¶] Felonious criminal conduct means committing conspiracy to commit the crime of possessing a weapon in a penal institution."

The jury was then instructed on the elements of conspiracy to possess a weapon in a penal institution pursuant to CALCRIM No. 415. The instruction stated in pertinent part:

"To prove that a defendant committed the offense of conspiracy to commit the crime of possessing a weapon in a penal institution, the People must prove that: [¶] One, the defendant intended to agree and did agree with the other defendant or unnamed coparticipants to commit the crime of possessing a weapon in a penal institution; [¶] Two, at the time of the agreement the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of possessing a weapon in a penal institution; [¶] Three, one of the defendants or both of them committed at least one of the following alleged overt acts to accomplish the crime of possessing a weapon in a penal institution: received kites, possessed kites, attempted to destroy kites, destroyed kites or monitored penal institution staff to warn other co-conspirators when penal institution staff were present; [¶] And, four, at least one of these overt acts was committed in California. [¶] . . . [¶]

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit the crime [of] possessing [a] weapon in a penal

14

institution.  The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

"An overt act is an act by one or more members . . . of the conspiracy that is done to help accomplish the agreed-upon crime.  The overt act must happen after the defendant has agreed to commit the crime.  The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself."

2. *Arguments of Counsel*

The prosecutor argued that defendant had participated in a "conspiracy to possess weapons in county jail."  The prosecutor asserted that defendant had been an "active recipient[]" of the kites, including the kite that discussed how to possess weapons in jail: "How to hoop it, where to put it, why it's important to have it."

Defendant questioned how receiving kites, or attempting to destroy kites, would help someone possess a weapon in the jail.  He also questioned how "possession of a writing" could "mean that you are conspiring to do what is written in the writing."

3. *Standard of Review*

When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319-320.)  "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses."  (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.)

15

*4.     Analysis*

"Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 (*Rodrigues*).)

In this case, there was strong evidence that members of the Nuestra Familia organization conspired to possess weapons in jail. The evidence established that the Nuestra Familia's jail activities included committing assaults, and that carrying a weapon for the Nuestra Familia was a way to show allegiance to the gang. The evidence showed that the Nuestra Familia used kites to communicate that its members needed to be ready for "battle" and should secure weapons in a manner that would prevent them from being discovered by jail guards. Based on this evidence, the jury could reasonably conclude that members of the Nuestra Familia organization had agreed to possess weapons in the jail.

There was also evidence to support a finding that defendant had agreed to, and intended to, participate in the Nuestra Familia's conspiracy to possess weapons in jail. Based on the evidence presented, the jury could infer that defendant had not merely possessed the kites in order to pass them along to someone else, but that he himself had read the kites and was therefore aware of their contents. Importantly, most of the kites were addressed generally, to *all* members of the Nuestra Familia organization in the jail. Most of the kites were self-described as "abreastment[s]," meaning that they were intended to convey information to all Nuestra Familia organization members in the jail. Most of the kites had information that would be relevant to all Nuestra Familia organization members in the jail. Thus, a jury could reasonably infer that defendant himself—a Norteño gang member in the jail—was the intended recipient of the kites in

16

his cell, and that he was not someone who was merely responsible for passing the kites to someone else.

The jury could also reasonably conclude that, having read the kites, defendant agreed to participate in the Nuestra Familia's conspiracy to possess weapons in jail, based on the content of the kites. Several of the kites warned Nuestra Familia organization members to be prepared for violent action and to be working together, rather than having conflicts with members of other subsets. One kite specifically described how Nuestra Familia organization members should ensure that weapons are "secured in the anal cavity," and another kite instructed Nuestra Familia organization members how to carry items in their anal cavities. In addition, the jury heard how defendant had previously carried methamphetamine in his anal cavity, which together with the overwhelming evidence of his gang membership supported an inference that he was carrying the drugs for the gang pursuant to the Nuestra Familia's instructions. Together, this evidence tended to show that defendant had agreed to participate in the Nuestra Familia's conspiracy to possess weapons in the jail.

Finally, the evidence showed that defendant tried to prevent the kites from being confiscated by the deputies searching his cell. Not only did those efforts to destroy evidence demonstrate a consciousness of guilt (see *People v. Holloway* (2004) 33 Cal.4th 96, 142), but they further showed defendant's level of engagement in the Nuestra Familia's activities and thus supported an inference that defendant had read the kites containing instructions from the gang and had agreed to participate in the activities described in the kites.

Based on the evidence presented and the reasonable inferences drawn from that evidence, a trier of fact could reasonably infer that defendant had tacitly agreed with other members of the Nuestra Familia organization to possess weapons in the jail. While the evidence could perhaps also support a finding that defendant was merely passing the kites to someone else, "reversal of the judgment is not warranted simply because the

17

circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In sum, substantial evidence supports defendant's conviction of active participation in a criminal street gang.

## C. *Uncharged Prior Act*

Defendant contends the trial court abused its discretion by admitting evidence of the January 2016 incident in which defendant was found in possession of methamphetamine in the jail. He contends the trial court erred under state law and that the error violated his federal constitutional due process rights.

The People argue that the trial court properly admitted the evidence pursuant to Evidence Code section 1101, subdivision (b) to show defendant's intent, and that the probative value of the uncharged act was not substantially outweighed by its potential for prejudice under Evidence Code section 352.

### 1. *Trial Court's Ruling*

During motions in limine, defendant's trial counsel addressed the admissibility of the prior incident. Defendant's trial counsel argued that the prior incident was not relevant to show defendant's association or membership in a criminal street gang, and he objected under Evidence Code section 352. Defendant's trial counsel further argued that "the fact that [defendant] may have possessed contraband in the jail previously can't be introduced to show that he possessed contraband for a particular purpose on a particular day."

The prosecutor argued that the prior incident was relevant to show defendant's participation in and knowledge of a conspiracy to transport contraband in "one's rectum," as described in some of the kites found in defendant's cell.

The trial court found that the prior incident was relevant to show that defendant had "an intent to agree with other persons . . . to conceal and have or to inform others as to how to conceal and have controlled substances within the county jail."

18

At the end of trial, the trial court noted that the People had withdrawn their theory that a conspiracy to relating to controlled substances was the felonious conduct underlying count 1 (active participation in a criminal street gang). Instead, the People's theory was that the felonious conduct was a conspiracy to possess weapons in a penal institution. The trial court indicated it had assessed the admissibility of the prior incident again and determined it was still admissible under Evidence Code sections 1101, subdivision (b) and 352.

    2.    *Limiting Instruction*

Pursuant to CALCRIM No. 375, the jury was instructed:

"The People presented evidence that the defendant Juarez on or about January 20th, 2016, committed the offense of possession of a controlled substance in a penal institution that was not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact committed the uncharged offense. Proof of the preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense, you may, but are not required to consider that evidence for the limited purpose of deciding whether or not:

"On about August 18th, 2016, the defendant acted with the intent to agree with others to commit the crime of possession of a weapon in a penal institution and whether or not at the time of any agreement the defendant intended that one or more members of a conspiracy would commit the crime of possession of a weapon in a penal institution.

"In evaluating this evidence consider the similarity or lack of similarity between the uncharged offense and the charged offenses.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.

"If you conclude that the defendant committed the uncharged offense[,] that conclusion is one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in this case or that the allegations have been proved.  The People must still prove each charge and allegation beyond a reasonable doubt."

3.      *Legal Principles*

Evidence Code section 1101, subdivision (b) is an exception to the general rule barring character evidence.  It permits "the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b).)

For purposes of showing intent pursuant to Evidence Code section 1101, subdivision (b), "[t]he least degree of similarity (between the uncharged act and the charged offense) is required."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)  "[T]he uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' "  (*Ibid.*)

Evidence Code section 352 provides that the "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

20

"The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) Rather, " '[t]he "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*Ibid.*)

We review the trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for an abuse of discretion. (*People v. Story* (2009) 45 Cal.4th 1282, 1295.) Under this deferential standard, the trial court's ruling will " 'not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Rodrigues*, *supra*, 8 Cal.4th at p. 1124.)

*4.      Analysis*

Defendant contends "the uncharged crime and the charged offense were not sufficiently similar" to support an inference that he intended to participate in a conspiracy to possess weapons in jail. Defendant argues that there was no evidence that he conspired to possess drugs in jail, no evidence he ever actually possessed weapons in jail, and no evidence he possessed drugs at the time of the charged offense.

Defendant contrasts his case with *People v. Leon* (2015) 61 Cal.4th 569, in which the court found that two prior robberies were sufficiently similar to the charged crimes, all of which were robberies or robbery-murders, to show intent and common plan. (*Id.* at p. 598.) In *Leon*, the prior robberies were committed close in time to some of the charged robberies, and a gun stolen during one of the uncharged robberies was used in some of the charged robberies. The court rejected the defendant's claim that the robberies had to share "distinctive" characteristics. (*Ibid.*)

21

Here, the prosecution presented evidence that defendant was a Norteño gang member who had committed a prior crime for the benefit of a gang, and who was participating in the Nuestra Familia organization's activities in the jail by possessing kites. The prosecution presented evidence that the Nuestra Familia organization engages in drug activity both inside and out of jails and prison. The prosecution presented evidence that the Nuestra Familia organization sent a kite intended as an "abreastment" that instructed Norteños to carry gang "materials" in the anal cavity. This evidence, combined with the evidence of defendant's prior act of carrying methamphetamine in his anus, indicated that defendant intended to help the Nuestra Familia gang with its drug activity. That inference, in turn, supported the further inference that defendant intended to help the Nuestra Familia gang with other activity involving contraband in jail, including the possession of weapons.

The similarities between the two incidents were sufficient to support an inference that defendant harbored the same intent—to participate in a gang conspiracy to possess contraband in jail—in both instances. (See *Ewoldt*, *supra*, 7 Cal.4th at p. 402.) Both incidents occurred in the jail. The prior incident involved defendant actually carrying drugs in his anal cavity, and the charged incident involved several kites instructing Norteños to carry weapons and other gang "materials" in their anal cavities. Both incidents involved defendant attempting to hide contraband from correctional officers. On these facts, the trial court did not abuse its discretion by finding the prior uncharged act admissible under Evidence Code section 1101, subdivision (b).

We next address defendant's claim that the probative value of the uncharged act evidence was low while its potential for prejudice was high, such that the trial court should have excluded the evidence pursuant to Evidence Code section 352.

Defendant notes that the jury did not learn whether or not he was convicted of the drug offense, presenting a "risk that the jury would be motivated to punish the defendant for the uncharged offense." (See *People v. Walker* (2006) 139 Cal.App.4th 782, 806

22

(*Walker*).) Defendant also argues that the uncharged act was "[a]rguably . . . more inflammatory" than the charged offense, in that he "actually possessed methamphetamine in a penal institution" whereas there was no evidence he had ever possessed a weapon. (See *ibid*. [prejudicial effect is increased where "the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses"].)

As the People point out, "the uncharged act was a non-violent drug trafficking offense rather than a weapon-related offense," which at least arguably would be viewed by the jury as less inflammatory than the charged offense. The uncharged act was relatively close in time to the charged offense—about eight months earlier. (See *Walker*, *supra*, 139 Cal.App.4th at p. 806 ["amount of time between the uncharged acts and the charged offense" is relevant to probative value].) As explained above, there were significant similarities between the two offenses. The trial court could reasonably conclude, after conducting the required balancing under Evidence Code section 352, that the probative value of the uncharged act evidence was not substantially outweighed by its potential for prejudice.

In sum, the trial court did not abuse its discretion by admitting the prior uncharged act evidence.

## D. *Senate Bill No. 1393*

Defendant contends, and the Attorney General concedes, that his case must be remanded so the trial court can exercise its discretion whether to strike the prior felony conviction allegation under section 667, subdivision (a), pursuant to Senate Bill No. 1393. We accept the Attorney General's concession.

Senate Bill No. 1393, which amended section 667, subdivision (a), and section 1385 to grant trial courts discretion to strike or dismiss a prior serious felony allegation was not yet in effect at the time the trial court sentenced defendant in March 2018. "Senate Bill 1393 applies retroactively to all cases or judgments of conviction in which a five-year term was imposed at sentencing, based on a prior serious felony

23

conviction, provided the judgment of conviction is not final . . . ."  (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971-972.)

Because defendant's conviction is not yet final, remand is required to allow the trial court to exercise its discretion whether to strike the allegation.  (See *People v. Garcia*, *supra*, 28 Cal.App.5th at pp. 971-974.)

### III.     DISPOSITION

The judgment is reversed and the matter is remanded for resentencing for the superior court to determine whether to strike defendant's prior serious felony conviction (Pen. Code, § 667, subd. (a)).

_____
                                                Cogliati, J.[*]


WE CONCUR:




_____
            Greenwood, P.J.




_____
            Elia, J.




<u>People v. Juarez</u>
H045680

_____

[*] Judge of the Santa Cruz County Superior Court assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.